ACHENBACH *v.* MEARS.

1. EXCHANGE OF PROPERTY — IMPLIED WARRANTY — STOCK OF MERCHANDISE.

General rule that in the absence of an express warranty there is no implied warranty as to quality, fitness or condition as to merchandise open to inspection is not altered because it may be inconvenient to examine the goods or might take some time to do so on the part of one exchanging equity in farm for store and merchandise and fixtures therein.

2. SALES—STATEMENTS AS TO VALUE—NEGLIGENCE.

False statements of value will rarely void a bargain since value is usually a matter of opinion and statements relative thereto are rarely supposed to have induced a purchase without negligence upon the part of the purchaser.

3. EXCHANGE OF PROPERTY—STORE—BUSINESS—VALUE.

Usually a person who has a store or other business to sell has a right to claim whatever value he desires for it, particularly when he is trading it for something else.

4. SALES—CAVEAT EMPTOR—EXPRESS WARRANTY.

Application of doctrine of *caveat emptor* to sales of personal property works no hardship since purchaser who distrusts his own judgment can require of the seller an express warranty as to quality or condition.

5. EXCHANGE OF PROPERTY—FRAUD—OPPORTUNITY TO EXAMINE.

Plaintiffs who had exchanged their farm for store and merchandise and fixtures therein, had ample opportunity to examine the merchandise, make inventory and have competent appraisal but did not do so, may not complain that representations as to value and quality were false.

6. SAME—FRAUD—FALLING OFF OF SALES.

Plaintiffs who had exchanged their farm for general store and business located in a small hamlet *held*, not entitled to rescission because sales fell off after change in ownership and sales force.

7. SAME—VALUE OF STORE BUILDING.

Statements of defendants, owners of general store in small hamlet, as to value of building itself, made incident to exchange thereof for plaintiffs' farm assessed at smaller amount than value given for purposes of the exchange *held*, insufficient basis upon which to grant rescission for fraud where plaintiffs were in a position to know as much about the value of the building as defendants.

8. SAME—FRAUD—RESCISSION—DELAY.

One who discovers he has been defrauded in an exchange of property must act promptly in order to be entitled to rescission, which proceeds upon theory that by reason of fraud the title to the property never passed.

9. SAME—RESCISSION—FRAUD.

In action to rescind exchange of farm property for general store and business in small hamlet, plaintiffs must establish such a case of fraud as to prevent passing of the title of the merchandise from defendants to them.

10. SAME—FRAUD—WAIVER—RESCISSION.

Owners of farm who exchanged it for general store and business in small hamlet who took possession and conducted store for about five or six months after discovery of fraud *held*, to have waived fraud complained of so as to bar rescission therefor.

11. ESTOPPEL—ACQUIESCENCE.

Acquiescence of a party who might take advantage of an error obviates its effect.

12. FRAUD—RESCISSION—WAIVER—LIMITATION OF ACTIONS.

Purchaser of property, claiming to have been defrauded must, to rescind, act promptly and subsequent dealings with the property acquired, as if title had passed, bars rescission, but the purchaser may affirm the purchase and sue to recover damages for fraud if he brings suit within the statute of limitations.

13. SAME—DISCOVERY—EXECUTORY CONTRACTS.

If fraud is discovered while a contract to purchase property is executory, subsequent payment of the purchase price affirms the fraud.

14. EXCHANGE OF PROPERTY—RESCISSION—EQUITY.

Rescission of exchange of farm for general store and business in small hamlet *held*, impracticable where parties who thereby acquired farm sold it before commencement of suit upwards of five months after consummation of contract.

15. SAME—NOTICE—BULK SALES LAW.

Parties to contract of exchange of farm for general store and merchandise and fixtures therein *held*, chargeable with knowledge of the terms of the bulk sales law (2 Comp. Laws 1929, §§ 9545-9547).

16. FRAUD—PRESUMPTIONS—PREPONDERANCE OF EVIDENCE.

Fraud is easily charged, sometimes difficult of proof and never presumed but must be established by a preponderance of the evidence.

17. EXCHANGE OF PROPERTY—FRAUD—BURDEN OF PROOF.

Plaintiffs who exchanged their farm for general store and business in a small hamlet had burden of proof in showing they were deceived, misled and defrauded to their injury, where no confidential relation existed between the parties to the trade.

18. FRAUD—EXCHANGE OF PROPERTY—BULK SALES LAW.

In suit to rescind exchange of farm for general store and merchandise and fixtures by parties who failed to comply with bulk sales law, parties who took store and had ample opportunity to examine buildings and stock but who had not been compelled to pay back accounts *held*, not entitled to damages for fraud but were entitled to have back accounts paid by other parties (2 Comp. Laws 1929, §§ 9545-9547).

NORTH, BUTZEL, and BUSHNELL, JJ., dissenting.

Appeal from Kalamazoo; Weimer (George V.), J. Submitted January 23, 1935. (Docket No. 125, Calendar No. 38,215.) Decided June 3, 1935. Rehearing denied September 10, 1935.

Bill by John A. Achenbach and wife against Thomas R. Mears and wife and Paul Murray for rescission of an exchange of property and other relief. Dismissed as to defendant Murray. Money decree for plaintiffs. Defendants appeal. Reversed.

*Arthur Robert Stratton,* for plaintiffs.

*Leo W. Hoffman (Carl E. Hoffman* and *Clare E. Hoffman,* of counsel), for defendants.

POTTER, C. J.   Plaintiffs filed a bill to rescind a trade based upon a written contract, or alternatively, in case rescission was impossible, to recover damages for fraud.

Plaintiffs owned a farm in Allegan county, valued at $7,500, subject to an outstanding incumbrance of $2,300.   October 5, 1933, they traded this farm with defendants Mears for a store in Fulton, Kalamazoo county, and gave back a chattel mortgage on the store building and fixtures in the sum of $2,300. Plaintiffs allege they were defrauded:

1.   As to the quality of the goods traded by defendants Mears to them;

2.   As to the value of the stock of merchandise;

3.   As to the value of sales of merchandise in the store;

4.   As to the value of the building used as a store.

(1)   It is not claimed there was any warranty of quality of the merchandise.   Such merchandise was open to inspection and there could be no implied warranty as to its quality, fitness or condition.   This general rule (Mechem on Sales [1st Ed.], § 1311) is not altered because it may have been inconvenient to examine the goods, or might have taken some time to do so.   Mechem on Sales (1st Ed.), § 1312.   Plaintiffs visited the store several times before they traded the farm for it; were anxious to trade; and desired to acquire a stock of goods.   They visited the real estate agent for the purpose of dealing the farm off in order that plaintiff John Achenbach might get into some other business than working in a paper mill.

(2) Value is usually a matter of opinion and statements of value can rarely be supposed to have induced a purchase, without negligence upon the part of the purchaser. False statements of value will rarely void a bargain. *Nowlin* v. *Snow,* 40 Mich. 699. Usually a person who has a store or other business to sell has a right to claim whatever value he desires for it, particularly when he is trading it for something else. Plaintiffs had an opportunity to examine the stock of merchandise and knew the manner in which the value of this stock could be determined, by an inventory, examination and appraisal of the property by persons competent to fix a value thereon. They made no attempt to have such an examination made, to have an inventory prepared, or an appraisal made.

"No principle of the common law has been better established, or more often affirmed, both in this country and in England, than that in sales of personal property, in the absence of express warranty, where the buyer has an opportunity to inspect the commodity, and the seller is guilty of no fraud, and is neither the manufacturer nor grower of the article he sells, the maxim of *caveat emptor* applies. Such a rule, requiring the purchaser to take care of his own interests, has been found best adapted to the wants of trade in the business transactions of life. And there is no hardship in it, because if the purchaser distrusts his judgment he can require of the seller a warranty that the quality or condition of the goods he desires to buy corresponds with the sample exhibited. If he is satisfied without a warranty, and can inspect and declines to do it, he takes upon himself the risk that the article is merchantable. And he cannot relieve himself and charge the seller on the ground that the examination will occupy time, and is attended with labor and inconvenience. If it is practicable, no matter how inconvenient, the

rule applies.'' *Barnard* v. *Kellogg,* 10 Wall. (77 U. S.) 383, 388.

There is no reason why plaintiffs should not have known, not only the quality of the merchandise for which they traded their farm, but also the value of the stock. They had ample opportunity to examine the merchandise and they could have had an inventory, examination and appraisal thereof.

(3) Plaintiffs claim there was misrepresentation as to the volume of sales. The volume of sales depends very much upon the individual who has charge of the sale of merchandise. Plaintiffs claim there were certain misrepresentations made as to the volume of sales, which defendants Mears deny, contending that whatever representations they may have made as to the volume of sales were true and nothing was said about the volume of sales until after the deal was consummated. The trial court did not regard the testimony as to the volume of sales important. This was a general store located in a small hamlet. It is easy to acquire merchandise by mail and, with modern automobile transportation, buyers purchase where they please. Fraud may not be predicated on a falling off of sales after change in ownership and sales force.

(4) It is claimed there were misrepresentations made as to the value of the building and the building was valued higher than it should have been. This building was being traded for a farm valued at $7,500 for the purpose of trading, and assessed at a smaller amount. Plaintiffs had an opportunity to examine the building; could have procured an estimate of its cost; were in a position to know as much about the value of the building as were the defendants Mears themselves, and we think no charge of fraud may be predicated upon any statement made

in attempting to consummate a trade of the kind involved here of the value placed upon the building which plaintiffs not only saw, but had ample opportunity to examine.

(5)    This trade was consummated on October 5, 1933. That is the date of the contract. Plaintiffs went into possession of the store on or about November 1, 1933. Plaintiffs knew as much about the stock of goods so far as its kind, character and quality is concerned within two weeks after they acquired possession as they ever did. Plaintiffs claim they knew they had been defrauded at that time. The witness Jessie Leach so testified. The bill of complaint was filed May 12, 1934. Some sort of a suit seems to have been commenced by summons May 8, 1934, by plaintiffs. In the meantime, plaintiffs had possession of the store and had been operating it for a period of approximately six months; and considerably more than five months after, they knew all about the quality of the goods purchased. One who discovers he has been defrauded must act promptly in order to be entitled to rescission, which proceeds upon the theory that by reason of fraud the title to the property never passed. In order to entitle plaintiffs to rescission, they must establish such a case of fraud as to prevent the passing of the title of the merchandise from the defendants Mears to them. If the plaintiffs after discovering the fraud treated the merchandise as their own and sold it, or offered it for sale, that might amount to a waiver of the fraud and an acquiescence in the transaction which had been consummated. Plaintiffs could not accept this stock of goods and carry on business in the usual and ordinary course for a period of about six months or thereabouts and then disaffirm the purchase upon the ground they had been misled and defrauded into making it. Plaintiffs claim title to the

stock of merchandise did not pass to them by reason of defendants Mears' fraud. At the same time, they took possession of the merchandise and for a period of six months or thereabouts continued to sell the same, and have had the use and benefit of the proceeds of such sales. Plaintiffs may not repudiate the contract as fraudulent and at the same time claim and retain the benefit which they have received therefrom or from the merchandise which they acquired in pursuance of such contract. *Merrill* v. *Wilson,* 66 Mich. 232; *Pangborn* v. *Continental Ins. Co.,* 67 Mich. 683; Black on Rescission and Cancellation (2d Ed.), §§ 590 to 615, inclusive. It has long been a settled maxim of the law that the acquiescence of a party who might take advantage of an error obviates its effect. A purchaser of property, claiming to have been defrauded, must, to rescind, act promptly. Subsequent dealings with the property acquired as if title had passed bars rescission, but the purchaser may affirm the purchase and sue to recover damages for the fraud. *Barnhardt* v. *Hamel,* 207 Mich. 232. Suit may be brought at any time within the statute of limitations. *Barnhardt* v. *Hamel, supra; Haukland* v. *Muirhead,* 233 Mich. 390. If the fraud is discovered while the contract is executory, subsequent payment of the purchase price affirms the fraud. *Foster Machine Co.* v. *Covel Manfg. Co.,* 219 Mich. 455.

(6) Notwithstanding the bill of complaint was filed for rescission, rescission was impracticable because, in the interval between the consummation of the contract and the commencement of suit, defendants Mears had sold the farm which they had acquired from plaintiffs. Plaintiffs did not act promptly in instituting suit which they were bound to do if, as they claim, they had been defrauded and if, as the proof shows, such fraud was discovered within two

weeks after the time they took possession of the store in question. *Geo. D. Sisson Lumber & Shingle Co.* v. *Haak,* 139 Mich. 383.

(7) Plaintiffs recovered judgment upon the ground of fraud, the rescission not being possible by reason of the sale of the farm acquired by defendants Mears from plaintiffs. The contract between the parties was drawn in disregard of the bulk sales law which plaintiffs understood existed, although they say they did not know the terms of such statute.* They neglected to obtain any counsel and relied upon the suggestions of a real estate dealer who was interested in earning his commission, who, it is claimed, represented that if plaintiffs obtained a bill of sale free from all incumbrances, the bulk sales law would not be operative; although at the very time they knew the defendants Mears owed at least $500 and were charged with notice they would be liable as the owners of the merchandise for the indebtedness of defendants Mears thereon.

(8) There was a provision in the written contract for exchange of property that the parties thereto relied solely upon their own judgment and not upon any representations made by one to the other. Plaintiff John Achenbach says he read and understood this agreement and that up to the time the agreement was made he relied solely upon his own judgment. The thing which he complained of was something which the defendants Mears failed to tell him. Upon cross-examination, he testified to substantially the same thing, and it was only after repeated leading questions plaintiff John Achenbach concluded he had relied upon statements of the defendants Mears as to the size and value of the stock

---

* 2 Comp. Laws 1929, §§ 9545–9547.—REPORTER.

and upon the representations which they had made as to the amount of business and other things.

(9)  Defendants Mears had taken an inventory of the stock some time before the transaction was consummated.  This is shown, not only by defendants Mears' testimony, by the production of the inventory in court, but by plaintiffs' witness, Mary Burr, who testified to being present in the store when the defendants Mears were taking an inventory.  In order to prove the stock of goods was not as great as defendants Mears had represented it to be, plaintiffs, after having conducted the business for six months or thereabouts, selling merchandise and having furnished certain of it to their relatives, and having acquired stock from other persons, by causing an inventory and appraisal of the stock of goods to be made from the amount of goods on hand, plus the amount of goods purchased, less the amount of goods sold, sought to establish the value of the goods six months before.  Some goods had been furnished by plaintiffs to their relatives and some had been removed from the store and placed in plaintiffs' house.  On the other hand, the defendants Mears produced Mr. Kiebler, an insurance adjuster, who had adjusted the loss at the time of a fire some time prior to the deal, and he testified that the value of the stock prior to depreciation was $5,422.04, and the value of the fixtures and other equipment $1,300, making a total value, including the fixtures, $6,722.04.

The inventory made by merchandise salesmen doing business with plaintiffs, together with the computations made thereon based on invoices and sales, indicates the value of the stock acquired by plaintiffs was at the time it was so acquired $1,649.84; and the trial court awarded damages to the extent

of $2,000 claimed by plaintiffs to have been suffered in acquiring this stock in the trade. This inventory was made after suit brought more than six months after plaintiffs went into possession of the property. It does not purport to be based upon the stock which plaintiffs acquired, but upon stock which had been substituted therefor. It was made for the purpose of being testified to on the trial and not for any purpose connected with the plaintiffs' business.

(10) The parties to this trade each had ample opportunity to examine the property traded for and apparently each of them knew of the existence of the bulk sales law, 2 Comp. Laws 1929, §§ 9545–9547, inclusive, and are chargeable with knowledge of its terms. Plaintiffs made no attempt to comply with the bulk sales law which they could have done; but by the trial court plaintiffs were given protection from the result of their own negligence in not complying therewith.

(11) Fraud is easily charged and sometimes difficult of proof. It is never presumed, but must be established by a preponderance of evidence. Plaintiffs must show they were deceived, misled and defrauded to their injury. No confidential relation existed between the parties to this trade. They dealt at arm's length, and there is nothing in this case to take it out of the general rule.

(12) After plaintiffs were in possession of the property, they knew or had an opportunity to know all about the quality and quantity of the merchandise acquired by the trade and everything else in connection therewith. Plaintiff John Achenbach testified in substance that if the defendants Mears had gone ahead and settled up their back accounts, he would not have said anything about the quantity or quality of the stock of merchandise acquired by

him. Though this matter seemed to him at the time of the trial to have been important, the witness testified he would not have instituted suit had defendants Mears settled up their back accounts chargeable against the stock of merchandise acquired. This, defendants Mears ought to do.

(13) Plaintiffs have not been compelled by the merchandise creditors of defendants Mears to pay any of their unpaid bills for merchandise acquired. If they are hereafter compelled to do so, the disposition of this case will not bar any right of action they may otherwise have against defendants Mears therefor.

Decree reversed, with costs.

FEAD, WIEST, and EDWARD M. SHARPE, JJ., concurred with POTTER, C. J.

NORTH, J. (*dissenting*). This appeal presents a controlling issue of fact. After seeing and hearing the witnesses for the respective parties the circuit judge found defendants guilty of actionable fraud. He denied relief to plaintiffs by way of rescission, and in lieu thereof, decreed that defendants should respond in damages to plaintiffs, the amount awarded to be deducted from a chattel mortgage which defendants took from plaintiffs in consummating the fraudulent transaction. The findings of the circuit judge, covering 10 pages of the printed record, contain a careful and detailed recapitulation of the testimony. I am of the opinion that the decree entered in the circuit court is sustained by the proofs in the case.

The relief was granted solely on the ground that defendants fraudulently misrepresented to plaintiffs the size or amount of the stock of general merchandise which defendants, as a part of this transaction,

traded to plaintiffs for their equity in a farm. Plaintiffs allege this stock was represented by defendants to inventory at approximately $4,600. Defendants admit it was represented to be of an inventory value of approximately $4,000. The circuit judge found this value did not exceed $2,000. This finding is supported by an inventory made about six months after plaintiffs took possession of the stock. This inventory was obtained by adding to the stock then on hand the amount of merchandise sold by plaintiffs in the meantime and by deducting from this total the amount of the merchandise bought by plaintiffs and placed in stock during the same period. Fairly accurate records were presented of both the purchases and sales. In addition there was credible testimony that at or about the time suit was started this stock was larger than when plaintiffs took possession, and an inventory taken at this later date disclosed a value of approximately $2,300. The record is convincing that defendants misrepresented the size and value of this stock of general merchandise.

There was delay on the part of plaintiffs in bringing suit for rescission, accounting, etc. We quote a part of the record bearing upon the circumstances surrounding such delay and also upon plaintiffs' reliance upon defendants' alleged misrepresentation. Plaintiff John A. Achenbach testified:

"I did have a discussion or talk with Mr. Mears about the inventory which he had taken. He told me that they had just completed their inventory due to this cotton tax, and that it amounted to $4,600. He told me that I should say perhaps a week before the agreement. I asked to see the inventory. He first told me it was over to the house and Mr. Mears and I went over to the house, and when we got over there, he said he couldn't find it; it must be back to the store, and wasn't anything more said that night

about it. The inventory was mentioned two or three different times. I never saw the inventory. We did discuss a little bit about the inventory, but Mr. Mears dissuaded me in having one taken.  \*  \*  \*

"*Q.* Did you place your sole reliance upon the representations that Mr. Mears made to you as to the value of the merchandise?

"*A.* Yes.  \*  \*  \*

"*Q.* You have testified that Mr. Mears represented to you that the inventory which he had just completed amounted to $4,600?

"*A.* That is right.

"*Q.* In entering into this agreement did you rely upon that statement of Mr. Mears' that the inventory amounted to $4,600?

"*A.* I did.  \*  \*  \*

(Cross-examination:) I never had any experience in a mercantile business, nor had my wife.  \*  \*  \* I didn't have any idea exactly how much the stock was worth, except what Mr. Mears told me.

"*Q.* Didn't make any effort to learn, did you?

"*A.* The reason that we—

"*Q.* (Interrupting:) Answer the question; didn't make any effort to learn?

"*A.* No, sir. I had no inventory taken."

On cross-examination plaintiff further testified:

"*Q.* So far as you are concerned, you went there and looked the stock over, he had been up and seen your farm, and you decided to trade?

"*A.* Yes, sir.

"*Q.* You relied on your own judgment, you and your wife?

"*A.* Yes, sir."

But on redirect examination he testified as follows:

"*Q.* You have testified, Mr. Achenbach, that up to the time the deal was made you relied on your own judgment in making the deal?

"*A.* That is right.  \*  \*  \*

"*Q.* What did you rely on in forming your judgment, in making your judgment?

"*A.* Well, mostly, of course, on what Mr. Mears had told me * * * partially on my own, and it was Mr. and Mrs. Mears told Mrs. Achenbach and myself a great many things in regard to the store and more or less influenced us that way. * * *

"*Q.* What did you rely on in determining that it was a fair trade?

"*A.* Well, on Mr. Mears' inventory and his figures."

Further, as bearing upon the question of delay in taking an action in consequence of the alleged fraud, the same witness testified (cross-examination):

"*Q.* Two weeks after you took possession (November 2, 1933) you discovered you had been defrauded, didn't you?

"*A.* Yes, to a certain extent.

"*Q.* Why didn't you take an inventory?

"*A.* Well, it is like I said this morning: In the first place, if Mr. Mears had gone ahead and settled up his back accounts, I wouldn't have said anything about it, but since he didn't—(witness interrupted) * * * I don't know as I ever complained to him about the inventory being smaller than what we thought. It was perhaps, oh, six weeks or two months before we had really decided that there wasn't as much merchandise as what there was supposed to have been. * * *

(Direct examination:)

"It took me six weeks or two months because we were totally unfamiliar with the grocery business or dry goods and it was after the salesmen began calling and we began getting acquainted with them that we started asking questions. * * *

(Cross-examination:)

"*Q.* So the reason you didn't discover that this inventory wasn't as large as it should have been

when you bought it, because you were unfamiliar with the business, isn't that so?

"*A.* That is right.

"*Q.* And you didn't discover that until when?

\* \* \*

"*A.* Probably six weeks or two months before we were certain that it wasn't, or quite certain.

"*Q.* Two months. Two months at the most you knew the inventory wasn't what it should have been?

"*A.* Yes, sir, we figured it wasn't."

In disposing of this case it should be borne in mind that it now presents only the question of awarding damages if plaintiffs have established the alleged fraud. Appellants have not questioned, nor could they question, jurisdiction of the equity court to dispose of the whole matter, because they filed a cross-bill in which equitable relief was also sought by them but not granted in the circuit court.

In the opinion filed the circuit judge said:

"Our first impression upon this record might easily be that plaintiffs acquiesced in the situation with full knowledge of it and that they waived fraud, if any, that had been perpetrated upon them, but, upon mature consideration and deliberation, I think we cannot rightfully conclude that plaintiffs at any time, with full knowledge and understanding of the situation, acquiesced in such, if any, wrong as had been perpetrated nor that they knowingly and understandingly waived such, if any, fraud as had been perpetrated. It seems very clear to me that defendants definitely and intentionally overreached the plaintiffs in respect to the—at least in respect to the inventory and the value of the stock just prior to the exchange. I am satisfied that the defendants materially misrepresented the value of the merchandise, the inventory of the merchandise, to plaintiffs who were, because of an entire lack of experience in

such affairs, wholly at a loss to cope with the statements and representations made by the defendants."

One who makes a fraudulent misrepresentation as to a matter exclusively within his knowledge, as did the defendants in the instant case relative to inventory value of the stock, cannot seize upon the theory of *caveat emptor* as a means of defense. *Johnson* v. *Campbell*, 199 Mich. 186; *John Schweyer & Co.* v. *Mellon*, 196 Mich. 590.

"In a suit to rescind a contract on the ground of fraud and deceit, it is no defense that plaintiff was unduly gullible." *Bailey* v. *Perkins* (syllabus), 224 Mich. 27.

See, also, *O'Neill* v. *Kunkle*, 244 Mich. 653.

"This court has frequently held that it does not lie with the perpetrator of a fraud to say that his victim was too credulous, and reposed too much confidence in those with whom he dealt and who assumed to have superior knowledge of the subject upon which they spoke." *Matteson* v. *Weaver*, 229 Mich. 495; citing cases.

Even in a case wherein rescission, instead of damages, was decreed we have stated the rule 'as to delay barring recovery as follows:

"This court has many times held that one seeking relief for fraud must act promptly after its discovery. *Draft* v. *Hesselsweet*, 194 Mich. 604; *Bowen* v. *Stocklin*, 215 Mich. 341. The mere lapse of time, however, is not sufficient to constitute laches. *Backus* v. *Backus*, 207 Mich. 690; *Walker* v. *Schultz*, 175 Mich. 280; *Humiston, Keeling & Co.* v. *Yore*, 181 Mich. 629. The delay in moving may always be explained, and, if satisfactorily accounted for, relief will be granted, notwithstanding the lapse of time. *Mulheron* v. *Henry S. Koppin Co.*, 221 Mich. 187." *Bayley* v. *Friedberg*, 226 Mich. 125, 128.

"While we hear chancery cases *de novo* and are not controlled by the finding of fact of the trial judge, we should not overlook the fact that he had an advantage we do not possess, that of seeing, hearing the witnesses in open court. While not controlling, his opinion as to their credibility is always helpful." *Steele* v. *Shaffer,* 241 Mich. 632.

Under this record, I am of the opinion that the decree entered in the circuit court should be affirmed, with costs to appellees.

BUTZEL and BUSHNELL, JJ., concurred with NORTH, J. NELSON SHARPE, J., did not sit.