KING v FORD MOTOR CREDIT COMPANY

Docket No. 233931. Submitted May 20, 2003, at Detroit. Decided June 24, 2003, at 9:30 A.M.

Estella King and others brought a class action in the Wayne Circuit Court against Ford Motor Credit Company and others, alleging, in part, violation of the Michigan Motor Vehicle Sales Finance Act (MVSFA), MCL 492.101 *et seq.*, as a result of the plaintiffs' purchase of motor vehicles and extended service contracts for the vehicles through retail installment contracts. On cross-motions for summary disposition, the trial court, Amy P. Hathaway, J., dismissed the part of the plaintiffs' complaint that alleged that the MVSFA prohibited the sale or financing of extended service contracts by automobile dealers. The court also held that the MVSFA did not limit the price that the defendants could charge for an extended service contract and also that they could finance a travel-emergency benefit component of an extended service contract. The court dismissed the part of the complaint relating thereto. The court also held that the MVSFA limited the price of nontravel-emergency benefits of extended service contracts and that the defendants could not charge and finance an amount in excess of the actual cost of the nontravel-emergency benefit component. Therefore, part of the plaintiffs' motion for summary disposition was granted and part of the defendants' motion for summary disposition was denied. The court further held that, to the extent that a profit was earned in excess of the cost of nontravel-emergency benefits of extended service contracts, the defendants breached their contracts with the plaintiffs. Summary disposition with respect to that allegation was granted in favor of the plaintiffs. The court also held that the MVSFA did not provide for a private right of action. The defendants appealed by leave granted.

The Court of Appeals *held*:

1. The MVSFA does not place constraints on the profit earned from the sale of a motor vehicle and any accessories or purchaser options that may be included or negotiated with the sale. The act is regulatory and sets forth the licensing and procedural fees charged in the sale of a motor vehicle through an installment sale contract.

2. The MVSFA does not regulate the purchase and sale of extended service contracts or extended warranties.

3. The trial court erred in dividing extended service contracts into travel-emergency benefits and nontravel-emergency benefits and concluding that the profit on an extended service contract violated provisions of the MVSFA. The act provides that limitations on the ability to contract for an extended service contract, which is, in effect, insurance, are not governed by the act.

4. The court erred in holding that the protections against fees and costs offered by the MVSFA governed the sale of an extended service contract. There was no breach of contract based on a violation of the MVSFA. The plaintiffs cannot rely on a claim of unjust enrichment because the parties' transactions were governed by written documentation. The order of the trial court must be reversed and the matter must be remanded for entry of an order granting summary disposition for the defendants.

Reversed and remanded.

AUTOMOBILES — EXTENDED SERVICE CONTRACTS — FINANCING.

The Motor Vehicle Sales Finance Act does not govern the sale of extended service contracts and does not prevent the inclusion of the price of such contracts in the retail installment contract for the purchase of a motor vehicle (MCL 492.101 *et seq.*).

*Mantese Miller and Shea, P.L.L.C.* (by *E. Powell Miller* and *Gerard Mantese*), and Consumer Legal Services, P.C. (by *Christopher M. Lovasz* and *Mark Romano*), for the plaintiffs.

*Miller, Canfield, Paddock & Stone* (by *Thomas G. Parachini* and *Lindsay L. Bray-Andreuzzi*) for Ford Motor Credit Company.

*Bodman, Longley & Dahling LLP* (by *Lloyd C. Fell* and *Sandra L. Jasinski*) for General Motors Acceptance Corporation.

*Garan Lucow Miller PC* (by *Peter L. Diesel*) for Riverside Ford Sales, Inc.

*Kemp, Klein, Umphrey & Endelman, PC* (by *James P. Davey*), for Merollis Chevrolet Sales & Service, Inc.

*Colombo & Colombo, P.C.* (by *Robert Y. Weller, II*), for Village Jeep/Eagle, Inc., and Zubor Buick, Inc.

*Dickinson Wright PLLC* (by *Barbara H. Erard* and *Paul R. Bernard*) for Chrysler Financial Company, LLC.

Amici Curiae:

*Colombo & Colombo, P.C.* (by *Robert Y. Weller, II*), for Detroit Auto Dealers Association.

*Willingham & Coté* (by *Raymond J. Foresman*) for Michigan Auto Dealers Association.

Before: JANSEN, P.J., and KELLY and FORT HOOD, JJ.

FORT HOOD, J. Defendants[1] appeal by leave granted from the trial court's order granting in part and denying in part cross-motions for summary disposition. We reverse and remand for entry of an order granting defendants' motion for summary disposition and denying plaintiffs' motion for summary disposition.

---

[1] Defendants Riverside Ford Sales, Incorporated (Riverside Ford), Merollis Chevrolet Sales & Service, Incorporated (Merollis), Village Jeep Eagle, Incorporated (Village Jeep), and Zubor Buick, Incorporated (Zubor), are the automotive dealerships from which plaintiffs purchased their vehicles. Plaintiffs Estella King, Dennis Kochan, Denise Reed, and Charles Porter are individual car purchasers and, for ease of reference, will be referenced by their last names. Defendants Ford Motor Credit Company (Ford Credit), General Motors Acceptance Corporation (GMAC), and Chrysler Financial Company, LLC (CFC), were the financing agencies utilized by plaintiffs and defendant dealerships.

I. BASIC FACTS AND PROCEDURAL HISTORY

Plaintiffs filed a class action complaint and demand for a jury trial alleging violations of the Michigan Motor Vehicle Sales Finance Act (MVSFA), MCL 492.101 *et seq.*, and a violation of the Michigan Consumer Protection Act (MCPA), MCL 445.901 *et seq.* In 1997, plaintiff King entered into a retail installment contract with defendant Riverside Ford for the purchase of a new 1998 Ford Windstar with an extended service contract purchase price of $1,165. In 1998, plaintiff Kochan entered into a retail installment contract with defendant Merollis for the purchase of a new 1997 Chevrolet Venture with an extended service contract price of $520. In 1997, plaintiff Reed entered into a retail installment contract with defendant Village Jeep for the purchase of a new 1997 Plymouth Voyager with an extended service contract price of $1,495. Defendants Ford Credit, GMAC, and CFC provided the financing for the purchase of the vehicles and the service contracts. Each dealership received a portion of the price of the service contract. Plaintiffs brought suit on behalf of themselves and "thousands" of other consumers who have financed the purchase of a motor vehicle and extended service contract through a retail installment contract, alleging that defendants engaged in a scheme to sell motor vehicle service contracts to car buyers at inflated prices to include car dealer commissions in violation of statutory and common law. It was alleged that the financing of the purchase of a motor vehicle and the service contract in the retail installment contract violated the MVSFA. Any charge in excess of the dealers' cost for the service contracts also was an alleged violation of the MVSFA. It was alleged that the holders of the retail

installment contracts, defendants Ford Credit, GMAC, and CFC, were liable to the same extent as the car dealerships. Lastly, plaintiffs alleged that the contracts violated the MCPA.

In lieu of answering dispositive motions filed by defendants, plaintiffs filed a first amended complaint. This complaint added plaintiff Porter. In 1998, plaintiff Porter entered into a retail installment contract with defendant Zubor for the purchase of a Buick Century, which included a service contract price of $1,090, financed by defendant GMAC. Plaintiffs' first amended complaint alleged five counts: (I) violation of provisions of the MVSFA that preclude a car dealer from extending credit to a car buyer to finance service contracts;[2] (II) that even if a car dealer may extend credit to a car buyer to finance a service contract, the car dealer is prohibited by the MVSFA from directly or indirectly receiving part of the sale price; (III) defendants Ford Credit, GMAC, and CFC were also liable under the MVSFA for directly or indirectly receiving part of the sale price of the service contracts and financing service contracts; (IV) reformation/breach of contract on the basis that the retail installment contracts created contractual relationships between the parties and the contracts, in violation of the MVSFA, resulting in illegal and unenforceable payments; and (V) unjust enrichment on the basis that defendants received and continued to receive the benefit of unlawful payments from plaintiffs.[3]

Both parties filed cross-motions for summary disposition. Defendants alleged that the MVSFA did not

---

[2] The trial court ultimately ruled against plaintiffs on this issue, and plaintiffs have not filed a cross-appeal. Therefore, we do not address it.

[3] The amended complaint did not pursue any claim based on the MCPA.

prohibit the sale and financing of extended-protection service plans. Defendants noted that the Division of Financial Institutions, the body charged with the administration and oversight of the statute, consistently concluded that automotive dealerships may sell and finance extended service protection, and the Legislature had acquiesced in that determination. Rather, the only requirement imposed by administrative bulletins was that the cost of the warranty be expressed as a separate item. It was further alleged that the extended service contract qualified as a travel-emergency benefit, an item that was offered to the buyer through the principle of liberty of contract. The buyer was not required to purchase the extended service contract, which was the result of a negotiation between the car buyer and seller. Lastly, defendants alleged that a private right of action was not provided for in the MVSFA.

Plaintiffs alleged that the MVSFA was enacted in 1950 to regulate retail and installment sales of motor vehicles and eliminate the abuse occurring in the transactions. The abuse included unreasonable and unjust finance charges, failure to disclose exact fees, "kickbacks," inadequate remedies to purchasers, and inadequate insurance protection for purchasers. While a manufacturer's suggested retail price for a new car must be disclosed to consumers, there was no comparable disclosure requirement with respect to an extended service contract. Plaintiffs alleged that "[c]onsumers d[id] not regularly bargain over the price of a service contract, but pa[id] whatever the dealer ask[ed]." Consequently, the dealer charged as much as six to twelve times the dealer cost for a service contract. Plaintiffs alleged that the MVSFA pre-

cluded the seller from collecting fees in excess of premium costs, fees, and expenses that were authorized by the act. By statute, the Legislature had not authorized the service contract as a cost to the buyer; therefore, it could not be included in an installment sale contract. Additionally, any fee or cost was limited to the actual charge. Thus, the dealer could not earn a profit on the sale of an extended service contract. Plaintiffs alleged that because the contracts were illegal, plaintiffs were entitled, as a matter of law, to a refund or credit for the excess charges collected by defendants. Plaintiffs also alleged that defendants were liable on the basis of unjust enrichment.

Plaintiffs filed a response to defendants' motions, alleging that the statute, by referencing enforcement of a judgment, did, in fact, provide for a private cause of action against defendants. Plaintiffs also asserted that an extended service contract could not qualify as an option, accessory, or travel-emergency benefit. Options and accessories were hardware features that were physically installed on a vehicle. Furthermore, the claim of unjust enrichment could proceed as an alternative theory to the claim of breach of contract in the event it was not upheld.

A written order granting in part and denying in part the cross-motions for summary disposition was entered. The trial court held that the MVSFA did not prohibit the sale or financing of the extended service contracts by the dealers. Therefore, defendants prevailed on that issue, and count I of plaintiffs' first amended complaint was dismissed. The trial court further held that the MVSFA did not limit the price that defendants could charge and that they could finance a travel-emergency benefit component of an extended

service contract. Therefore, to the extent that count II of the first amended complaint alleged a violation for the sale of an extended service contract at a profit for the component part of travel-emergency benefits, the count was dismissed. The trial court held that the MVSFA limited the price of nontravel-emergency benefits of extended service contracts, and defendants could not charge and finance an amount in excess of the actual cost of the nontravel-emergency benefit component. Thus, plaintiffs' motion for summary disposition with regard to this portion of count II was granted and defendants' motion was denied. The trial court further held that, to the extent that a profit was earned in excess of the cost of nontravel-emergency benefits of extended service contracts, defendants breached their contracts with plaintiffs, and summary disposition in favor of plaintiffs with respect to count IV was proper. Lastly, the trial court held as a matter of law that the MVSFA did provide for a private right of action.

## II. STANDARD OF REVIEW AND RULES OF STATUTORY CONSTRUCTION

The trial court's grant or denial of summary disposition is reviewed de novo. *Stone v Michigan,* 467 Mich 288, 291; 651 NW2d 64 (2002). This issue also presents a question of statutory construction. Issues of statutory construction present questions of law that are reviewed de novo. *Cruz v State Farm Mut Automobile Ins Co,* 466 Mich 588, 594; 648 NW2d 591 (2002). The primary goal of statutory interpretation is to give effect to the intent of the Legislature. *In re MCI Telecom Complaint,* 460 Mich 396, 411; 596 NW2d 164 (1999). This determination is accomplished

by examining the plain language of the statute. *Id.* If the statutory language is unambiguous, appellate courts presume that the Legislature intended the meaning plainly expressed and further judicial construction is neither permitted nor required. *DiBenedetto v West Shore Hosp*, 461 Mich 394, 402; 605 NW2d 300 (2000). Statutory language should be reasonably construed, keeping in mind the purpose of the statute. *Draprop Corp v Ann Arbor*, 247 Mich App 410, 415; 636 NW2d 787 (2001).

If reasonable minds could differ regarding the meaning of a statute, judicial construction is appropriate. *Adrian School Dist v Michigan Pub School Employees' Retirement Sys*, 458 Mich 326, 332; 582 NW2d 767 (1998). When construing the statute, a court must look at the object of the statute in light of the harm it is designed to remedy and apply a reasonable construction that will best accomplish the purpose of the Legislature. *Marquis v Hartford Accident & Indemnity (After Remand)*, 444 Mich 638, 644; 513 NW2d 799 (1994). Michigan recognizes the maxim "*expressio unius est exclusio alterius*" that the express mention in a statute of one thing implies the exclusion of other similar things. *Bradley v Saranac Community Schools Bd of Ed*, 455 Mich 285, 298; 565 NW2d 650 (1997). However, this maxim is merely an aid to interpreting legislative intent and will not govern if the result would defeat the clear legislative intent. *Grand Rapids Employees Independent Union v Grand Rapids*, 235 Mich App 398, 406; 597 NW2d 284 (1999). The legislative history of an act may be examined to ascertain the reason for the act and the meaning of its provisions. *DeVormer v DeVormer*, 240 Mich App 601, 607; 618 NW2d 39 (2000). A preamble

is not to be considered authority for construing an act, but it is useful for interpreting statutory purpose and scope. *Malcolm v East Detroit*, 437 Mich 132, 143; 468 NW2d 479 (1991). In 2A Singer, Sutherland Statutory Construction (6th ed), § 47:04, pp 219-226, the following statements addressing preambles are instructive:

> A preamble consists of statements which come before the enacting clause in a statute. It usually gives reasons for the operative provisions which follow . . . .

> \*      \*      \*

> The preamble can neither limit nor extend the meaning of a statute which is clear. Similarly, it cannot be used to create doubt or uncertainty. If the statute is clear and the whole act method of interpretation is used, the true meaning is derived from all parts of the act regardless of whether the preamble is more or less extensive than the purview. Whole act interpretation produces a more defensible result than exclusion of the preamble even though the result may be the same.

> The preamble may be employed to extend the meaning of an ambiguous statute beyond the limited language of the purview. This rule must be qualified by the explanation that the result must be consistent with other rules of interpretation.

### III. HISTORICAL STATUTORY CREATION AND ANALYSIS

According to the Michigan Legislature's website,[4] a resolution is

> [a] document expressing the will of the House or the Senate (or both, in the case of concurrent resolutions). Resolutions

---

[4] www.michiganlegislature.org

are used to urge state agencies or the Congress to take certain actions; to formally approve certain plans of governmental agencies; to conduct certain legislative business; or to establish study committees to examine issues. Some resolutions are also offered by members as an expression of congratulations, commemoration or tribute to an individual or group.

On January 31, 1950, a meeting of the Senate Committee to Investigate Motor Vehicle Financing resulted in the following resolution:

Whereas, This Committee has conducted an investigation into the cost of financing and purchasing motor vehicles, pursuant to the provisions of Senate Resolution No. 34 of the 1949 Session of the Michigan Legislature; and

Whereas, The investigation of this Committee has disclosed that abuses by finance companies engaged in financing the purchase of motor vehicles by the public, as heretofore reported by a prior committee which was created during the 1948 Special Session of the Legislature pursuant to Senate Concurrent Resolution No. 14, are continuing; and

Whereas, A recent study of this Committee has disclosed that as regards finance charges arising from the installment sale of motor vehicles within the state of Michigan, 28.48% of such charges are in excess of 25%, 14.7% of such charges are in excess of 50%, 7.66% of such charges are in excess of 75%, and 5% of such charges are in excess of 100%; and

Whereas, It is the sense of this Committee that all finance charges in excess of 25% are unreasonable and unjust and constitute an usurious practice inimical to the public interest; and

Whereas, The investigation of this Committee indicates that finance companies in Michigan, among other things, are not required by law to make a just rebate to purchasers of finance charges which are unearned and which arise when purchasers of motor vehicles discharge their retail installment retail contracts, in nearly all instances, in advance of the maturity date, and that, in some instances, the failure to rebate such unearned finance charges results

in interest rates in excess of 1000% in the purchase of motor vehicles; and

Whereas, The investigation of this Committee indicates that there is no disclosure of the exact amount of finance charges and automobile insurance to the purchaser of a motor vehicle at the time and place of sale, and that as a result of said non-disclosure, free competition in the financing of motor vehicles is discouraged and, in most cases, the purchaser is mislead [sic] as to the exact amount of finance charges which are being included in the purchase contract; which constitutes, in the judgment of this Committee, a practice inimical to the public interest; and

Whereas, The investigation of this Committee discloses that retail installment sales contracts of motor vehicles contain concealed charges in the nature of "kickbacks", which are in no way regulated as to amount and are payments made by finance companies to motor vehicle dealers for the purpose of securing business from such dealers, and are in the nature of concealed charges and a deceptive trade practice in the judgment of this Committee; and

Whereas, The investigation of this Committee discloses that, under the present law, purchasers of motor vehicles are not properly protected in the repossession procedure, in that the seller is not required to give notice of the amount necessary to redeem a repossessed motor vehicle, and in that the law contains no requirements establishing the place of resale of such motor vehicle; and

Whereas, The investigation of this Committee discloses that the purchasers of motor vehicles on retail installment sales contracts are given inadequate legal and equitable remedies under the present law, in that actions to maintain their rights are costly, time consuming, and are often fraught with the necessity of costly and ineffective disclosure proceedings to uncover dealings between finance companies and motor vehicle sales agencies, as a result of which few actions are brought to enforce the right of purchasers and the regulation of abuses is consequently imperfect and ineffectual and it is the sense of this Committee that laws and regulations should be instituted and made

effective to provide a remedy for an aggrieved purchaser procuring redress short of court action; and

Whereas, The investigation of this Committee has revealed that, in the retail installment sales of motor vehicles, all too frequently insurance is provided to the purchaser which only insures the interest of the finance company in the unpaid balance of retail installment sales contracts, which practice is not unjust provided that the purchaser know and realize the nature of the insurance so provided, but which information is all too frequently found in small print and is not disclosed to the purchaser; and

Whereas, It is the sense of this Committee that legislation should be enacted to control and regulate retail and installment sales of motor vehicles and to eliminate the abuses some of which are hereinbefore set forth, now therefore be it

Resolved by the Committee of the Senate, created by Senate Resolution No. 34 of the 1949 Regular Session of the Michigan Legislature, That the Governor of the State of Michigan, G. Mennen Williams, be requested to include in his message to the 1950 Special Session of the Michigan Legislature, a recommendation that the Legislature consider the enactment of legislation to control and regulate retail installment sales of motor vehicles; and be it further

Resolved, That said committee does also recommend the enactment of an act similar to that contained in Senate Bill No. 60, as originally introduced in the 1949 Session of the Michigan Legislature by Senator Harry F. Hittle, and as passed by the Michigan State Senate, and does further suggest that the Governor of the State of Michigan include such recommendations in his message to the Legislature at the forthcoming Session, if such be the Governor's desire.

The Legislature did, in fact, act with respect to the resolution. The Motor Vehicle Sales Finance Act became effective on March 31, 1951. The act contains the following preamble:

AN ACT defining and regulating certain installment sales of motor vehicles; prescribing the conditions under which

such sales may be made and regulating the financing thereof; regulating and licensing persons engaged in the business of making or financing such sales; prescribing the form, contents and effect of instruments used in connection with such sales and the financing thereof; prescribing certain rights and obligations of buyers, sellers, persons financing such sales and others; limiting charges in connection with such instruments and fixing maximum interest rates for delinquencies, extensions and loans; regulating insurance in connection with such sales; regulating repossessions, redemptions, resales and deficiency judgments and the rights of parties with respect thereto; authorizing extensions, loans and forbearances related to such sales; authorizing investigations and examinations of persons engaged in the business of making or financing such sales; transferring certain powers and duties with respect to finance companies to the commissioner of the financial institutions bureau; and prescribing penalties. [1950 PA 27, amended by 1970 PA 114, effective July 23, 1970.]

Thus, an examination of the resolution underlying the impetus for the legislation and the preamble to the legislation, *Marquis, supra; Malcolm, supra,* indicates that the MVSFA was designed to address usurious fees and improper conduct that occurred in the financing of an automobile. The act does not place any constraints or limitations on the profit earned from the sale of a motor vehicle and any accessories or purchaser options that may be included or negotiated with the sale.

Furthermore, review of the statute reveals that its predominant purpose is to set forth licensing and procedural requirements governing a motor vehicle installment sale. Briefly, a person may not engage in the sale of motor vehicles under installment contracts unless the seller is licensed in accordance with the terms of the act. MCL 492.103. An application for a

license to engage in installment sales must be in writing to the administrator, MCL 492.104, with the administrator defined as the commissioner of the Financial Institutions Bureau, Department of Commerce. MCL 492.102(17). Renewal of existing licenses must occur annually. MCL 492.104(e). In order to obtain the license, a bond must accompany the request to the administrator, MCL 492.105, and the fees to be charged the applicant are set forth by statute. MCL 492.106. Upon receipt of a license, it must be posted in a conspicuous place in the business, the license is not transferable or assignable, and the rejection of any application may be appealed to the circuit court. MCL 492.107; MCL 492.108.

The administrator has the authority to revoke or suspend any license if he finds various violations. MCL 492.109. Significantly, the administrator has the right to revoke where the "licensee has violated any provisions of this act . . . ." MCL 492.109(a)(2). In conjunction with that authority, the administrator is authorized to investigate and examine the business records of any licensee or any person engaged in business contemplated by the act. MCL 492.110(a). The administrator is also "empowered" to require the attendance and testimony of witnesses and the production of records, and, if disobedience occurs, the administrator may seek aid from any circuit court to obtain an order that requires a witness to obey. Any failure to obey the order may be punished as a contempt of court. MCL 492.110(b). The administrator also has the authority to "make rules and regulations relating to the enforcement of this act." MCL 492.110(c).

The act also precludes an acceleration clause, places limitations on repossession, and prohibits the inclusion of certain provisions in the installment sale contract. MCL 492.114. Notice of any sale, transfer, or assignment must be given to the buyer. MCL 492.115. While the buyer may be required to obtain insurance under the installment sale contract, there are limitations. MCL 492.116. The statute contains additional regulations regarding extension of the contract, refinancing charges, defaults, collection, prepayment, payment, and the requirement that the act comply with the Federal Truth in Lending Act, 15 USC 1601 *et seq.* MCL 492.119, 492.120, 492.121, 492.122, 492.122a. An entity that operates under the act without a license or a licensee that violates the act may be found guilty of a misdemeanor and sentenced to pay a fine of not more than $500 for the first offense, and face imprisonment, not to exceed a year, for subsequent offenses. MCL 492.137. Thus, an overall review of the statute reveals that it is regulatory, setting forth the licensing and procedural fees charged in the sale of a motor vehicle through an installment sale contract without restricting the parties' ability to negotiate the terms of the sale or the profit margin earned on the sale.

The issue in this litigation is whether the dealerships are entitled to earn a profit on the sale of extended service contracts or extended warranties in light of provisions of the MVSFA that regulate fees. Following review de novo, *Stone, supra,* we conclude that the challenge to the profit earned on an extended service contract is not governed by the MVSFA. Section 17 of the MVSFA, MCL 492.117, concerns installment

sale contracts and additional costs and fees relating thereto, and provides:

(a) In addition to the cost of insurance premiums and travel emergency benefits authorized in the preceding section of this act, the seller of a motor vehicle under an installment sale contract may *require* the buyer to pay certain other costs incurred in the sale of a motor vehicle under such contract as follows:

1. Fees, payable to the state of Michigan, for filing a lien or encumbrances on the certificate of title to a motor vehicle sold under an installment sale contract or collateral security thereto.

2. Fees, payable to a public official, for filing or recording and satisfying or releasing the installment sale contract or instruments securing the buyer's obligation.

3. Fees for notarization required in connection with the filing and recording or satisfying and releasing a mortgage, judgment lien or encumbrance.

(b) The seller of a motor vehicle under an installment sale contract may also contract with the buyer to pay, on behalf of the buyer, such other costs incidental to the sale of a motor vehicle and contracted for voluntarily by the buyer as follows:

Fees, payable to the state of Michigan for registration of the motor vehicle and issuance or transfer of registration plates.

(c) The foregoing costs may be charged, contracted for, collected or received by the seller from the buyer independently of the installment sale contract, or the seller may extend credit to the buyer for the amount of such costs and include such amount in the principal amount financed under the installment sale contract.

(d) Such other costs paid or payable to the buyer shall not exceed the amount which the seller expends or intends to expend therefor. Any such costs which the seller has collected from the buyer, or which have been included in the buyer's obligation under the installment sale contract which

are not disbursed by the seller, as contemplated, shall be immediately refunded or credited to the buyer.

On the basis of the plain language of subsection 17(a), *In re MCI, supra,* extended service contracts or extended warranties are not covered by the statute because they are not an item that the buyer is *required* to purchase. Rather, like the sale of a motor vehicle, the extended service contract is the result of a negotiation between the buyer and the seller.[5] The resolution leading to the enactment of the act, the preamble to the act, and the text of the act demonstrate that it was designed to prevent the addition of usurious fees and costs following the negotiation of a purchase price of a motor vehicle, not to limit profit margins for items sold in conjunction with a motor vehicle.

Plaintiffs allege that the plain language of subsection 17(b) precludes a dealership seller from contracting for the sale of extended warranties because it identifies "other costs" as permissible, but then limits the list of "other costs" to registration and license-plate fees. Thus, under the maxim of *expressio unius est exclusio alterius,* plaintiffs allege that extended warranties may not be offered by the seller at a profit. However, this rule regarding the delineation of one thing implying the exclusion of other similar things will not govern if the result would defeat the clear legislative intent. *Grand Rapids Employees Independent Union, supra.* To apply this maxim, as urged by the plaintiffs, would defeat the purpose of

---

[5] Plaintiffs did not, by allegation in the complaint or through documentary evidence, dispute that the purchase of the extended service contract was the result of a negotiation between the buyer and the seller.

the statute. The MVSFA was not designed to limit the freedom of contract regarding the profit made on a motor vehicle and negotiated additions to the vehicle. In essence, the MVSFA is a regulatory statute designed to set forth a procedure and place restrictions on the fees and costs, not the profits, associated with an automotive installment sale contract.

Alternatively, plaintiffs allege that profits may not be earned on the sale of an extended warranty or service contract in light of MCL 492.131:

> (a) A licensee under this act shall not charge, contract for, collect, or receive from the buyer, directly or indirectly, any further or other amount for costs, charges, examination, appraisal, service, brokerage, commission, expense, interest, discount, fees, fines, penalties, or other thing of value in connection with the retail sale of a motor vehicle under an installment sale contract in excess of the cost of insurance premiums, other costs, the finance charges, refinance charges, default charges, recording and satisfaction fees, court costs, attorney's fees, and expenses of retaking, repairing, and storing a repossessed motor vehicle which are authorized by this act.

> *        *        *

> (d) Whenever in an installment sale contract under this act the seller or any subsequent holder has charged, contracted for, collected, or received from the buyer prohibited costs or charges in connection with the contract, all the costs and charges in connection with the contract, other than for insurance, shall be void and unenforceable and any amounts paid by the buyer for such costs and charges, other than insurance, shall be applied on the principal of the contract.

Again, plaintiffs rely on general, undefined, and broad language such as "other costs" to allege that defendants may not earn a profit on the sale of an

extended service contract. However, the reference to "other costs" is utilized in conjunction with statutory provisions outlining what the dealer may or may not require with respect to the amount of insurance and the amount of fees. The plain language of the statute in no way alters the profit margin the dealership may receive on the sale of a motor vehicle and any additions the purchaser selects. *In re MCI, supra.* Additionally, there is no indication that the freedom of contract to negotiate luxury items or warranties was intended to be altered by the creation of the MVSFA. Rather, on the basis of the language of the resolution and the preamble, it is clear that the MVSFA was designed to address what was occurring after the price of a car and any accessories had been negotiated. Specifically, after the purchaser negotiated a price, hidden charges and fees would then be added on to the sale contract. The act, it appears, was designed to remedy the price gouging with respect to procedural fees that were being added after the negotiation.

The trial court's conclusion that the MVSFA was violated was based on § 16 of the MVSFA, MCL 492.116. Subsection 16(a) provides, in relevant part:

> The buyer of a motor vehicle under an installment sale contract may be required to provide insurance on such motor vehicle at the buyer's expense for the protection of the seller or subsequent holder. Such insurance shall be limited to insurance against substantial risk of damage, destruction or theft of such motor vehicle: Provided, however, That the foregoing shall not interfere with the liberty of contract of the buyer and seller to contract for travel emergency benefits pertaining to the operation of the automobile or other or additional insurance as security for or by reason of the obligation of the buyer, and inclusion of the

cost of such insurance premium and said travel emergency benefits in the principal amount advanced under the installment sale contract.

Although the statute contains a definitional section, MCL 492.102, it does not define travel-emergency benefits. The trial court noted that the extended service contracts contained language to indicate that coverage for rental vehicles and towing repairs was included in the extended service contracts. Therefore, to the extent that these items were not regulated with respect to profits because of liberty of contract, the trial court held that the travel-emergency benefits portion of the extended service contracts was not a violation of the statute. However, the sentence in subsection 16(a) at issue also contains the undefined terms "other" and "additional insurance":

> Such insurance shall be limited to insurance against substantial risk of damage, destruction or theft of such motor vehicle: *Provided, however, That the foregoing shall not interfere with the liberty of contract of the buyer and seller to contract for travel emergency benefits pertaining to the operation of the automobile or other or additional insurance as security for or by reason of the obligation of the buyer,* and inclusion of the cost of such insurance premium and said travel emergency benefits in the principal amount advanced under the installment sale contract. [Emphasis added.]

The parties fail to address how an extended service contract or warranty operates. We note that the extended service contract is, in effect, insurance. Insurance is a contract in which one party, for consideration, assumes delineated risks of the other party. *St Paul Fire & Marine Ins Co v American Home Assurance Co,* 444 Mich 560, 564; 514 NW2d

113 (1994).[6] That is, the purchaser of a motor vehicle buys an extended service contract to cover parts and labor for problems that may arise after the expiration of the manufacturer's warranty. There is no guarantee that the purchaser will ever seek service following the purchase of the extended service contract and thus derive a benefit from the consideration paid. However, in the event that vehicle maintenance is required, the purchaser is protected against contingencies delineated in the extended service contract. The statute provides that "liberty of contract" is not affected with respect to "additional insurance as security for or by reason of the obligation of the buyer . . . ." MCL 492.116(a). Consequently, if the buyer chooses to purchase an extended service contract, the plain language of the statute provides that limitations on the ability to contract for this type of insurance option are not governed by the MVSFA. *In re MCI*, *supra*. Thus, the trial court erred in dividing extended service contracts into travel-emergency benefits and nontravel-emergency benefits and concluding that the profit on an extended service contract violated the provisions of the MVSFA. A division of the extended service contract into travel-emergency benefits and nontravel-emergency benefits is inappropriate where the statute expressly provides that "other or additional insurance" items pertaining to the opera-

---

[6] See also *Allstate Ins Co v Elassal*, 203 Mich App 548, 555; 512 NW2d 856 (1994), noting additional definitions of insurance: (1) " 'coverage by contract whereby one party undertakes to indemnify or guarantee another against loss by a specified contingent or peril,' " (2) " 'the sum for which something is insured,' " and (3) " 'any means of guaranteeing against loss or harm.' " (Further citations omitted.)

tion of a motor vehicle are not affected because it would cause an interference with liberty of contract.[7]

Plaintiffs contend that consumers need the protections of the MVSFA to prevent price gouging with respect to extended service contracts. However, an educated consumer has options to negotiate the purchase price of an extended service contract. Extended warranties may be purchased from the automobile manufacturer, new and used car dealerships, and independent companies or third parties.[8] Extended warranties may be purchased online[9] and may extend for a period past that offered by a dealership or manufacturer. Consumers are urged to research whether an extended warranty is necessary in light of the cost. Indeed, Michigan's Attorney General has issued a warning in a consumer alert on the Attorney General's website[10] regarding extended service contracts that provides:

> Some dealers offer "extended service contracts" to supplement the protection of new vehicle warranties. These contracts should be reviewed with great caution. Many companies that provide extended service contracts have no

---

[7] We note that plaintiffs cite a study by the attorney general of New York in 1990 that identified a significant "mark up" charged by dealerships over the manufacturer's suggested retail price of the extended service contract or warranty. While the study identified a significant price increase and noted that customers frequently do not barter over the price of the extended service contract, the study failed to identify the actual profit margin earned following the expiration of the service-contract period.

[8] See http://auto.consumerguide.com/auto/editorial/features/index.cfm/act/feature1 4.

[9] However, California, Florida, and Wisconsin prohibit the online purchase of certain auto warranties. http://auto.consumerguide.com/auto/editorial/features/index.cfm/act/feature1 4.

[10] See <http://www.michigan.gov/ag/0,1607,,7-164-17343_18163-44647—,00.html>.

affiliation with the vehicle dealership. They have less incentive to encourage repeat business. The benefits of an extended service contract usually do not become effective until your vehicle's manufacturer's warranty expires. Unlike manufacturer's warranties, extended service contracts are usually not comprehensive. Rather than listing components and claims that are *excluded* from coverage, extended service contracts may identify a short list of components and claims that *are covered*. These contracts may also place an upper limit on the amount that will be paid on a claim. They may also impose complicated procedures for obtaining approval for covered repairs, including a requirement that the vehicle be inspected by the company selling the contract. Consumers should also be wary of contracts that exclude coverage for "preexisting conditions" as well as those that require the consumer to pay the cost of diagnosing the cause of a component failure. On the whole, extended service contracts provide substantially less protection than manufacturer's warranties and are riskier. You should carefully consider whether the total costs of such a plan outweighs the likely benefits. [Emphasis in original.]

Thus, it is noteworthy that the Attorney General has not issued a plea to the Legislature to regulate the sale of extended service contracts or warranties and does not take action on behalf of consumers or urge the consumer to take action consistent with the MVSFA.[11] Rather, the statement by the Attorney General, notes, in essence, the maxim "caveat emptor," or let the purchaser take care of his own interests. See *Achenbach v Mears*, 272 Mich 74, 78; 261 NW 251 (1935). The trial court erred in concluding that the protections against fees and costs offered by the MVSFA governed the sale of an extended service con-

---

[11] The consumer advisory is merely noteworthy and is not referenced as authoritative in any regard. See *Danse Corp v Madison Hts*, 466 Mich 175, 182 n 6; 644 NW2d 721 (2002).

tract. The profit margin of an extended service contract was not contemplated by the Legislature, *Marquis, supra,* and the plain language of the statute forecloses the regulation of extended service contracts, which operate as an additional form of insurance for the purchaser. *In re MCI, supra; St Paul, supra.*[12]

The trial court also held that the violation of the MVSFA provided plaintiffs with an action for breach of contract. Following review de novo, *Stone, supra,* we disagree. Review of the first amended complaint reveals that the alleged breach of contract was based on the statutory violation. The sale of an extended service contract at a profit is not in violation of the statute.[13] Therefore, the claim of breach of contract on that basis also fails. Furthermore, a contract will not be implied under the doctrine of unjust enrichment where a written agreement governs the parties' transaction. *Barber v SMH (US), Inc,* 202 Mich

---

[12] We also note that proposed and enacted amendments of the MVSFA do not aid plaintiffs' position. The proposed amendment in 1995, House Bill 5659, would have removed unclear references to a "judgment" by expressly providing for a cause of action to be brought by the Attorney General, county prosecuting attorney, or person injured. This proposed amendment was not enacted. The MVSFA was amended in 2002, House Bill 6446, 2002 PA 699, to provide for increased document preparation fees that could be charged by installment sellers despite opposition from the administrator of the act. The administrator noted that language to modernize the act was being prepared and a bill to increase fees to consumers without other necessary changes was premature. This activity regarding the MVSFA, while not dispositive or controlling, demonstrates that the extension of consumer protections beyond regulatory fees and costs has not been realized despite the potential for price gouging in the sale of extended service contracts.

[13] Because of our conclusion that extended service contracts do not fall within the purview of the MVSFA, we need not address the circumstances under which a private right of action may be maintained under the MVSFA, leaving resolution of that issue for another day. *In re MCI, supra* at 424 n 4; *Van v Zahorik,* 460 Mich 320, 331 n 3; 597 NW2d 15 (1999).

App 366, 375; 509 NW2d 791 (1993). Because the parties' transactions were governed by written documentation, plaintiffs cannot rely on a claim of unjust enrichment, and our reversal of the trial court's order does not result in reinstatement of this claim.

Reversed and remanded for entry of an order granting defendants' motion for summary disposition and denying plaintiffs' motion for summary disposition. We do not retain jurisdiction.