*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0008P (6th Cir.)
File Name: 04a0008p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

E. STEPHEN DEAN,
　　　*Plaintiff-Appellant,*

　　　*v.*　　　　　　　　　No. 02-1421

THOMAS K. BYERLEY,
　　　*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Western District of Michigan at Lansing.
No. 01-00040—Gordon J. Quist, District Judge.

Argued: August 1, 2003

Decided and Filed: January 8, 2004

Before: DAUGHTREY, MOORE, and SUTTON, Circuit
Judges.

———————

## COUNSEL

**ARGUED:** Victoria V. Kremski, STATE BAR OF
MICHIGAN, Lansing, Michigan, for Appellee. E. Stephen
Dean, Piedmont, Missouri, pro se. **ON BRIEF:** Victoria V.
Kremski, STATE BAR OF MICHIGAN, Lansing, Michigan,
for Appellee. E. Stephen Dean, Piedmont, Missouri, pro se.

---

MOORE, J., delivered the opinion of the court, in which
DAUGHTREY, J., joined. SUTTON, J. (pp. 29-45),
delivered a separate dissenting opinion.

———————

## OPINION

———————

KAREN NELSON MOORE, Circuit Judge. This appeal
raises an important question concerning the scope of an
individual's right to engage in targeted residential picketing
in the wake of the Supreme Court's decision in *Frisby v.
Schultz*, 487 U.S. 474 (1988). We conclude that *Frisby* did
not place in question an individual's clearly established right
to engage in peaceful targeted residential picketing; rather it
carved out an exception to this right, allowing the government
to prohibit such picketing through a narrowly tailored and
applicable time, place, or manner regulation.

Plaintiff-Appellant, E. Stephen Dean ("Dean"), appeals the
district court's order granting summary judgment to
Defendant-Appellee, Thomas K. Byerley ("Byerley"), the
Regulation Counsel and Director of Professional Standards
Division for the State Bar of Michigan. Dean filed this action
under 42 U.S.C. § 1983, alleging that Byerley violated Dean's
First Amendment rights during a confrontation that occurred
while Dean was picketing in front of Byerley's residence.
Dean also brought state-law claims of assault and libel and
asked the district court to exercise supplemental jurisdiction
over these claims under 28 U.S.C. § 1367(a). The district
court granted Byerley's motion for summary judgment on the
federal claim, holding that Dean failed to establish that
Byerley acted under color of state law. The district court also
dismissed the state-law claims pursuant to 28 U.S.C.
§ 1367(c)(3).

Contrary to the district court, we conclude that Dean
created a genuine issue of material fact as to whether Byerley

acted under color of state law. We further hold that Dean had a constitutionally protected right to engage in targeted picketing on the street in front of Byerley's residence. As result, we also reach the issue of whether Byerley is entitled to an immunity defense. For the following reasons, we **REVERSE** the district court's grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

After graduating from the Thomas Cooley School of Law at age 60, Dean submitted his application for admission to the State Bar of Michigan in December 2000. When Dean delivered his application to the Executive Director of the State Bar of Michigan, Dean expressed concern that it was incomplete and explained that he was unable to recall the addresses of all of his prior residences. Dean alleges that subsequently State Bar of Michigan employees repeatedly requested additional information and refused to accept his explanation that he had done his best to obtain the required information, but that he could not remember the addresses of residences he had lived in over twenty-five years ago. After this interaction with the State Bar of Michigan employees, but before the Bar made a decision regarding Dean's bar application and before Dean took the bar exam, Dean began picketing to publicize the treatment he received from the State Bar of Michigan employees. Initially, Dean and two individuals hired by Dean picketed the State Bar of Michigan building. Then, on March 27, 2001, Dean and the hired individuals extended their picketing to Byerley's residence.

On the morning of March 27, 2001, Dean and the hired individuals picketed near Byerley's residence. Dean alleges that he and the hired individuals only picketed on the street in front of Byerley's residence. Byerley, on the other hand, alleges that Dean and the hired individuals also picketed on Byerley's private property. The parties agree, however, that on the morning of March 27, 2001, Dean and the hired individuals did not picket in front of any other residence in the neighborhood.

Dean further alleges that while he and the hired individuals were picketing near Byerley's residence, a confrontation occurred between Byerley and the picketers. Dean alleges that during the confrontation, Byerley told Dean "that because of his picketing the State Bar of Michigan and his home [Dean] would never be allowed to practice law in the state of Michigan. [Byerley] then stated that he was going to have [Dean] arrested for picketing." Second Am. Compl., Aug. 23, 2001, ¶¶ 13, 14. Dean also alleges that Byerley twice "intentionally drove his automobile directly towards [Dean]." *Id.* ¶ 11, 18. After the confrontation, Dean and the hired individuals left the area. Since the confrontation, Dean has not picketed near Byerley's residence or the State Bar of Michigan building.

Two days after the incident, on March 29, 2001, Byerley sent Dean a letter pertaining to the confrontation. This letter was written on State Bar of Michigan letterhead. In its entirety, the letter reads:

As you know, you and two other individuals were outside of my private residence on Tuesday, March 27, 2001 carrying signs. Although you have a right to exercise your First Amendment rights on public property, you do not have that right on private property.

On March 27 I verbally told you that you were on private property and that if you did not immediately leave I would call the police. This letter memorializes that statement. You are put on formal notice that you are never welcome on my private property and that if you trespass again I will ask that you be arrested.

Similarly, you are notified that you are not to enter the private property of any other State Bar of Michigan employee or officer.

I fully expect that you will not repeat your trespass.

Def.'s Br. in Supp. of Mot. for Summ. J., Ex. E.

On April 4, 2001, Dean commenced a pro se action against Byerley in the United States District Court for the Western District of Michigan. In this action, Dean brought a § 1983 claim, alleging that Byerley violated his First Amendment rights by threatening that Dean would never practice law in Michigan due to his picketing. Dean also brought two state-law assault claims, alleging that Byerley committed assaults by twice driving his car at Dean, and a state-law libel claim, alleging that Byerley committed libel by sending to third parties copies of his letter to Dean, in which he stated that Dean had trespassed. In his complaint, Dean requested approximately $2 million in compensatory and punitive damages and "equitable relief in the form of an order from [the district court] that Defendant refrain from interfering with Plaintiff's rights of free speech by threats of bodily harm or by threat of arrest." Second Am. Compl., Aug. 23, 2001, ¶ 45.

In August 2001, Byerley filed a motion for summary judgment. A magistrate judge concluded that summary judgment was proper based upon his determination that Dean did not have a constitutionally protected right to engage in targeted residential picketing. The magistrate judge recommended that the district court grant summary judgment to Byerley on Dean's § 1983 claim, and dismiss Dean's state-law claims pursuant to 28 U.S.C. § 1367(c)(3). The district court granted Byerley's motion for summary judgment, based instead upon its determination that Byerley did not act under color of state law when he allegedly threatened that Dean would not become a member of the State Bar of Michigan due to his picketing. In making this determination, the district court noted that Byerley was exercising the same authority possessed by private individuals to have an individual arrested for trespassing and to report an applicant's conduct to the State Bar of Michigan. The district court also

dismissed Dean's state-law claims pursuant to 28 U.S.C. § 1367(c)(3).

## II. ANALYSIS

### A. Standard of Review

This court reviews de novo the district court's grant of summary judgment. *Waters v. City of Morristown,* 242 F.3d 353, 358 (6th Cir. 2001). Summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Waters*, 242 F.3d at 358 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Additionally, the judge must not weigh the evidence but rather must "determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)) (internal quotation marks omitted). There is a genuine issue for trial if there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* (quoting *Anderson,* 477 U.S. at 252) (internal quotation marks omitted).

### B. Section 1983 Claim

#### 1. First Amendment

Dean filed this action under 42 U.S.C. § 1983, claiming that Byerley violated Dean's constitutionally protected right to engage in free speech. "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or laws of the United States." *Id.* at 358-59. Thus, to prevail on his § 1983 claim, Dean must prove that Byerley violated Dean's constitutionally protected right to

engage in free speech and that Byerley acted under color of state law.

The parties dispute whether Dean had a constitutionally protected right to engage in targeted picketing on the street in front of Byerley's residence. The district court did not reach this issue and instead granted Byerley's motion for summary judgment based upon its finding that Byerley did not act under color of state law. On appeal, Dean argues that, in the absence of an applicable time, place, or manner restriction, Dean had a constitutionally protected right to engage in targeted residential picketing. *See* Appellant's Br. at 16. Byerley counters that Dean did not have a constitutionally protected right to engage in targeted residential picketing, regardless of whether there is an applicable time, place, or manner restriction. *See* Appellee's Br. at 18-20.

We agree with the parties that there is no applicable Michigan statute that bans all targeted residential picketing. It is true that § 423.9f of the Michigan Code provides that "[i]t shall be unlawful . . . to engage in picketing a private residence by any means or methods whatever: Provided, That picketing, to the extent that the same is authorized under constitutional provisions, shall in no manner be prohibited." Mich. Comp. Laws § 423.9f. We conclude, however, that this provision is not applicable to the instant case. This statutory section appears in a chapter of the Michigan Code regulating labor and employment as part of the Employment Relations Commission Act 176 of 1939 ("Act").[1] *Id.* No Michigan court has issued a reported decision addressing the scope of the ban on private picketing contained in § 423.9f, so we must interpret this statutory section in order to determine whether it is applicable to this case.

---

[1]Section 423.9f was not part of the original Act, but was added as 1947 Mich. Pub. Acts. 318 and became effective October 11, 1947.

When construing a statute, we must look at the whole law and effectuate the legislature's intent. *Richards v. United States*, 369 U.S. 1, 11 (1962). As the Supreme Court has instructed, "We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act. . . . '[W]e must not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy.'"[2] *See id.* (citations omitted); *see also Owasso Indep. Sch. Dist. v. Falvo*, 534 U.S. 426, 434 (2002). Therefore, the ban on private residential picketing contained in § 423.9f must be read in conjunction with the rest of the statutory section in which it appears, and the Act as a whole. The Supreme Court has stated that "the meaning of statutory language, plain or not, depends on context." *Holloway v. United States*, 526 U.S. 1, 7 (1999) (internal quotation marks omitted); *see also Textron Lycoming Reciprocating Engine Div., Avco Corp. v. UAW*, 523 U.S. 653, 657 (1998). Reading the Act in its entirety reveals that the ban on private residential picketing applies only to labor picketing. The preamble declares that the Act regulates the behavior of employees and employers engaged in labor disputes. Mich. Comp. Laws § 423 pmbl. The preamble states that the Act is

AN ACT to create a commission relative to labor disputes, and to prescribe its powers and duties; to provide for the mediation and arbitration of labor disputes, and the holding of elections thereon; to regulate the conduct of parties to labor disputes and to require the parties to follow certain procedures; to regulate and limit the right to strike and picket; to protect the rights and privileges of employees, including the right to organize

---

[2]In fact, the Michigan Supreme Court has stated that the preamble may be considered when interpreting the scope and purpose of a statute. *Malcolm v. City of East Detroit*, 468 N.W.2d 479, 484 (Mich. 1991), *cited with approval in King v. Ford Motor Credit Co.*, 668 N.W.2d 357, 362-63 (Mich. Ct. App. 2003).

and engage in lawful concerted activities; to protect the rights and privileges of employers; to make certain acts unlawful; and to prescribe means of enforcement and penalties for violations of this act.

*See id*.  Additionally, the other sections of the Act govern employment relations by creating an employment relations commission, prescribing rules for collective bargaining and labor disputes, and defining unfair labor practices.  *See generally id*. § 423.  Finally, the other clauses of § 423.9f make it clear that the statutory section applies only to labor picketing.  Section 423.9f provides:

It shall be unlawful (1) for any person or persons to hinder or prevent by mass picketing, unlawful threats or force the pursuit of *any lawful work or employment*, (2) to obstruct or interfere with entrance to or egress from *any place of employment*, (3) to obstruct or interfere with free and uninterrupted use of public roads, streets, highways, railways, airports, or other ways of travel or conveyance, or (4) to engage in picketing a private residence by any means or methods whatever:  Provided, That picketing, to the extent that the same is authorized under constitutional provisions, shall in no manner be prohibited.  Violation of this section shall be a misdemeanor and punishable as such.

*Id*. (emphases added).  The title of the Act, the preamble, the other sections of the Act, and the surrounding clauses in the particular statutory section under consideration all clearly indicate that § 423.9f applies only to only labor picketing and not to all private residential picketing.

The dissent contends that if § 423.9f is read as applicable only to labor picketing, then the statute is unconstitutional, as it would amount to a content-based prohibition of speech, in

violation of the First and Fourteenth Amendments.[3] Dissenting Op. at 41-42.  Therefore, the dissent proposes that we read the statute broadly, as applicable to all targeted residential picketing.  *Id*.  We decline to interpret § 423.9f in the manner recommended by the dissent.  While federal courts often narrowly construe statutes in order to avoid striking them down on their face, we may not broadly construe a state statute in order to prevent the same result.  It would be tantamount to judicial legislation and would raise serious federalism concerns if we, a federal court, were to broadly construe § 423.9f to criminalize conduct that the Michigan Legislature did not make criminal.[4]

---

[3]The dissent states that "the Michigan Legislature surely could have taken the view that a statute that proscribes all residential picketing on all topics of speech was not only fair — because it would avoid favoring one subject of speech over another — *but it was the only choice available*." Dissenting Op. at 41 (emphasis added).  The dissent reasons that under *Carey v. Brown*, 447 U.S. 455 (1980), and *Frisby v. Schultz*, 487 U.S. 474 (1988), a law that bans only residential labor picketing would be unconstitutional.  *Carey* and *Frisby*, however, were decided more than thirty years after § 423.9f was enacted.

[4]In fact, the Michigan Supreme Court has stated that "[b]ecause courts are wary of creating crimes, penal statutes are to be strictly construed." *People v. Gilbert*, 324 N.W.2d 834, 843 (Mich. 1982).

The dissent characterizes his effort to read § 423.9f broadly as a refusal to accept a narrowing interpretation of the this provision. Dissenting Op. at 42.  As our analysis makes clear, § 423.9 only applies to labor picketing.  Moreover, none of the cases cited by the dissent support his effort to read § 423.9f in a manner that would criminalize more conduct than is actually prohibited by the statute.

In *Frisby v. Schultz*, 485 U.S. 474, 481-82 (1988), the Supreme Court accepted the district court's construction of the antipicketing ordinance at issue as not including an implied exception for labor picketing.  The ordinance banned all residential picketing, without exception.  *Schultz v. Frisby*, 619 F. Supp. 792, 794 (E.D. Wis. 1985).  An earlier version of the ordinance did in fact contain an exception for labor picketing, as an attempt to comply with a Wisconsin statute that specifies picketing is a permissible labor activity.  The city, however, repealed the earlier version of the ordinance–containing the exception for labor picketing–due to concerns that the ordinance violated the First Amendment by

discriminating against speech based upon its content. *Schultz v. Frisby*, 807 F.2d 1339, 1342 (7th Cir. 1986). The district court rejected the plaintiffs' argument that the newer version of the ordinance must contain an implied exception for labor picketing in order to comply with the Wisconsin statute. *Schultz*, 619 F. Supp. at 796. The district court pointed out that the legislative history clearly indicated that the ordinance did not contain such an exception. *Id*. The Supreme Court's acceptance of this refusal to imply an exception to the antipicketing ordinance did not increase the scope of conduct prohibited by the ordinance, for the ordinance already banned all targeted residential picketing.

In *Boos v. Barry*, 485 U.S. 312, 332-34 (1988), the Supreme Court held that two provisions of the District of Columbia Code did not combine to create an Equal Protection Clause violation. Section 22-1115 limited individuals' right to congregate within 500 feet of an embassy regardless of the message they sought to convey, and § 22-1116 stated that § 22-1115 did not prohibit labor picketing. *Id*. at 333-34. The Supreme Court accepted a narrowing construction of § 22-1115 as only prohibiting "congregations that threaten the security or peace of an embassy." *Id*. at 333. Therefore, the Supreme Court construed § 22-1115 as prohibiting individuals from engaging in violent congregations within 500 feet of an embassy, regardless of the message they sought to convey, and allowing all peaceful congregations. The Supreme Court then determined that § 22-1116 does not protect violent labor congregations; therefore, the statutes did not treat labor and nonlabor picketing differently. *Id*. The Supreme Court's refusal to read the labor picketing exception contained in § 22-1116 broadly so as to authorize violent labor picketing did not increase the scope of conduct prohibited by the ordinance, for § 22-1115 already banned all violent congregations.

Finally, in *United States v. Seeger*, 380 U.S. 163, 165-66 (1965), the Supreme Court broadened the conscientious-objector exception contained in the Universal Military Training and Service Act. Interpreting the Act in this manner actually lessened the range of conduct deemed criminal, rather than increased it.

The dissent cites these cases as support for his effort to read § 423.9f broadly, in a manner that would criminalize more conduct than is actually prohibited by the statute. The Supreme Court, however, has expressly held that retroactive application of judicially expanded criminal statutes violates due process. *Bouie v. City of Columbia*, 378 U.S. 347, 352-54 (1964); *see also Rogers v. Tennessee*, 532 U.S. 451, 456-460 (2001). Nothing in the cases cited by the dissent indicates that the Supreme Court has retreated from this position. Dean is not being prosecuted for violating § 423.9f; therefore, this case does not implicate the due process concerns present in *Bouie* and *Rogers*. Nevertheless, *Bouie* and *Rogers* strongly counsel against instituting a practice of broadly interpreting

Furthermore, because § 423.9f is not applicable to the instant case, it would be overreaching for us to comment on its constitutionality at this time.

Dean was not engaged in labor picketing when the confrontation at issue occurred; therefore, § 423.9f does not apply to Dean's conduct. The dissent asserts that Dean was engaged in labor picketing because he "*was* picketing about a matter related to labor and employment." Dissenting Op. at 38. Dean picketed to protest the treatment that he received from the State Bar of Michigan employees. That Dean's ability to obtain a law license in Michigan may affect his future employability does not convert his protest into labor picketing. The dissent cites no authority for his overly expansive definition of labor picketing.

Byerley has not identified any other Michigan law that bans residential picketing. Thus, proper resolution of this dispute turns on whether there is a constitutionally protected right to engage in targeted residential picketing in the absence of an applicable time, place, or manner restriction.

Over sixty years ago, the Supreme Court declared that use of the streets for assembly and communication is a right held by U.S. citizens pursuant to the First Amendment. *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515-16 (1939). The Supreme Court has also declared that "as a general matter peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment." *United States v. Grace*, 461 U.S. 171, 176 (1983). Although the Supreme Court has recognized that the government may regulate this use of the streets to ensure general comfort and order, the Court has warned that the government must not use such regulations to abridge or deny that right. *Hague*, 307 U.S. at 516. The Supreme Court considers streets and sidewalks to be public fora for purposes of First Amendment

criminal statutes so as to avoid constitutional infirmity.

scrutiny, and the Court has limited the government's ability to restrict First Amendment rights in such public fora. *Grace*, 461 U.S. at 177.

In *Frisby v. Schultz*, 487 U.S. 474 (1988), the Supreme Court discussed the limits on the government's ability to regulate use of streets for assembly and communication. The Court upheld against a facial challenge an ordinance adopted by Brookfield, Wisconsin "that completely bans picketing 'before or about' any residence." *Id*. at 476. The Court admonished that streets are traditional public fora; therefore, regulations of assembly and communication on streets must satisfy the appropriate level of scrutiny. *Id*. at 481. As the Court stated,

> In these quintessential public for[a], the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. . . . The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

*Id*. (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). The Court adopted a narrowing construction of the ordinance at issue and concluded that it only banned targeted picketing directed at a single residence. *Id*. at 482-83. The Court then held that the ordinance, narrowly construed, satisfied the scrutiny applicable to time, place, and manner regulations. *Id*. at 487-88.

Byerley points to passages in *Frisby* discussing the government's interest in protecting the privacy of the home to support his argument that there is no constitutionally protected right to engage in targeted residential picketing.

Appellee's Br. at 18-20. For example, Byerley quotes the following passage from *Frisby*:

> The type of focused picketing prohibited by the Brookfield ordinance is fundamentally different from more generally directed means of communication that may not be completely banned in residential areas. In such cases "the flow of information [is not] into . . . household[s], but to the public." Here, in contrast, the picketing is narrowly directed at the household, not the public. The type of picketers banned by the Brookfield ordinance generally do not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way. Moreover, even if some such picketers have a broader communicative purpose, their activity nonetheless inherently and offensively intrudes on residential privacy.

Appellee's Br. at 19 (quoting *Frisby*, 487 U.S. at 486) (citations omitted). Byerley acknowledges that *Frisby* does not preclude "targeted residential picketing in the absence of an ordinance or state law prohibiting it," but nonetheless asserts that targeted residential picketing is not constitutionally protected. Appellee's Br. at 20. In essence, Byerley argues that if targeted picketing "may be banned outright under First Amendment precedent, then the activity is inherently unworthy of constitutional protection." *Id*.

Contrary to Byerley's argument, Supreme Court precedent makes it clear that citizens have the constitutional right to use streets for assembly and communication. *See Hague*, 307 U.S. at 515-16. Although the government may restrict that right through appropriate regulations, that right remains unfettered unless and until the government passes such regulations. *See id*. at 516. While there are passages in *Frisby* that discuss the government's interest in protecting privacy of the home, *Frisby* does not support the proposition that the right to residential privacy automatically trumps the

right to engage in targeted residential picketing. *See Frisby*, 487 U.S. at 486-88. Rather, those passages in *Frisby* address one of the requirements for upholding time, place, and manner regulations, i.e., that the regulations "serve a significant government interest." *Id*. at 481 (quoting *Perry*, 460 U.S. at 45) (internal quotation marks omitted). Therefore, we conclude that the First Amendment protects the right to engage in peaceful targeted residential picketing in the absence of a narrowly tailored time, place, or manner regulation that meets the requirements laid down in *Frisby*.

### 2. Retaliation Claim

Dean has created a genuine issue of material fact as to whether Byerley violated Dean's First Amendment rights during the March 27, 2001 confrontation. While Dean does not explicitly label his claim as one of retaliation, his allegation that Byerley threatened that Dean would never practice law in the state of Michigan due to his picketing and his allegation that Byerley threatened to have the picketers arrested make it clear that Dean is asserting a garden-variety retaliation claim. This court has held that a § 1983 claim can be predicated upon a state official's retaliation against an individual for exercising his or her First Amendment rights. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394-95 (6th Cir. 1999) (en banc). "A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two — that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Id*. at 394.

When the confrontation occurred, Dean was allegedly picketing on the street in front of Byerley's residence, which is conduct protected by the First Amendment. Dean alleges that during the confrontation, Byerley threatened that Dean would never practice law in the state of Michigan due to his

picketing and Byerley threatened that he would have the picketers arrested.[5] A reasonable finder of fact could conclude that such conduct, if it actually occurred, would "deter a person of ordinary firmness" from the exercise of the right at issue. *See id*. Additionally, a reasonable finder of fact could conclude that the timing of events demonstrates a causal connection between Dean's engaging in protected conduct and Byerley's retaliation. Because Michigan has not passed an applicable time, place, or manner restriction, Dean had a constitutionally protected right to engage in peaceful targeted picketing in front of Byerley's residence. Retaliation against Dean for exercising that right would violate Dean's First Amendment rights. Thus, Dean has presented evidence supporting the first requirement of his § 1983 claim.

### 3. Under Color of State Law

To satisfy the second requirement of his § 1983 claim, Dean must show that Byerley acted under color of state law. The Supreme Court has held that "[t]he traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is

---

[5]The dissent contends that these threats do not constitute sufficient adverse action because Byerley sent a letter to Dean two days *after* the incident, which stated that Byerley only objected to Dean picketing on Byerley's private property, and because during a hearing on August 15, 2001, Dean stated that he withdrew his bar application voluntarily and not due to fear that Byerley would block it. Dissenting Op. at 44-45. These developments, which occurred after the March 27, 2001 incident, are not controlling because at the time Dean ceased picketing, he could have reasonably thought that Byerley would carry out these threats. Moreover, the dissent's assertion that the March 29, 2001 letter removed any fear of further adverse action is a factual finding that this court should not make in the first instance. Finally, the second prong of our three-part test for evaluating retaliation claims requires the plaintiff to allege that "an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394-95 (6th Cir. 1999) (en banc). This prong has been satisfied here.

clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). The Supreme Court has further held that "[s]tate employment is generally sufficient to render the defendant a state actor." *Id*. at 49 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 n.18 (1982)). Thus, "[i]t is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." *Id*. at 49-50 (citing *Monroe v. Pape*, 365 U.S. 167, 172 (1961)).

The district court granted Byerley's motion for summary judgment based upon its finding that Byerley did not act under color of state law. The district court found that "[i]n expressing his anger towards [Dean's] conduct, [Byerley] was not performing some duty of his office or exercising his official responsibilities. Rather, [Byerley's] conduct was that of a private citizen." Dist. Ct. Op. at 3. The district court found that Byerley merely asserted his right to seek to have Dean arrested for trespassing on private property and his right to report a complaint to the State Bar of Michigan regarding Dean's character and fitness. The district court concluded that all persons possess these rights, and thus that Byerley did not need state authority to act as he did.

The Supreme Court has held, however, that a defendant in a § 1983 action may still act under color of state law even though a private citizen could have taken the same action as that taken by the defendant. *Griffin v. Maryland*, 378 U.S. 130, 135 (1964). More specifically, the Supreme Court has held that "[i]f an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity or that the particular action which he took was not authorized by state law." *Id*. Thus, the fact that Byerley could have made a private report on Dean's character or privately sought a trespass action is not controlling, and it was inappropriate for the district court to grant summary judgment on that basis. Rather the

controlling issue is whether Byerley possessed state authority and whether Byerley purported to act under that authority. *See id.*

Byerley possessed state authority pursuant to his status as Regulation Counsel for the State Bar of Michigan.[6] Dean has presented evidence that Byerley purported to act under that state authority. In his complaint, Dean alleged that during the March 27, 2001 confrontation, Byerley stated "that because of [Dean's] picketing the State Bar of Michigan and [Byerley's] home [Dean] would never be allowed to practice law in the state of Michigan." Second Am. Compl., Aug. 23, 2003, ¶ 13. Then, on March 29, 2001, Byerley sent a letter on State Bar of Michigan letterhead, pertaining to the March 27, 2001 confrontation. In that letter, Byerley stated that if Dean trespassed on Byerley's property again, Byerley would request that Dean be arrested. The letter further stated that Dean was "not to enter the private property of any other State Bar of Michigan employee or officer." Def's Br. in Supp. of Mot. for Summ. J., Ex. E.

Additionally, Byerley has never explicitly denied Dean's allegation that Byerley acted under color of state law. In his answer, Byerley responded to Dean's allegation that Byerley acted under color of state law by admitting "that Plaintiff's allegations against Defendant arise from Defendant's status as Regulation Counsel for the State Bar of Michigan." Answer to First Am. Compl., June 20, 2001, ¶ 6. In neither Byerley's motion for summary judgment and his brief in

---

[6]In his brief in support of his motion for summary judgment, Byerley admits that the State Bar of Michigan is an agency of the Michigan Supreme Court. Def.'s Br. in Supp. of Mot. for Summ. J. at 12. Additionally, this court has concluded that the State Bar of Michigan is a state agency in similar circumstances. *Dubuc v. Michigan Bd. of Law Exam'rs*, 342 F.3d 610, 615 (6th Cir. 2003) (holding State Bar of Michigan is a state agency when it acts "for purposes of promulgating rules relating to Bar membership and determining whether to grant or deny Bar applications").

support of that motion nor his two supplemental briefs in support of that motion does Byerley deny that he was acting under color of state law. Finally, on appeal, Byerley does not even argue that he was not acting under color of state law.[7] Because Dean presented evidence demonstrating that Byerley acted under color of state law and because Byerley has never argued to the contrary, the district court should not have granted summary judgment based upon its finding that Byerley did not act under color of state law.

## C. Immunity

### 1. Absolute Immunity

Even if the plaintiff in a § 1983 claim establishes that the defendant violated his federal rights under color of state law, the defendant may raise an immunity defense. *See Harlow v. Fitzgerald*, 457 U.S. 800, 806-07 (1982).[8] The Supreme Court has recognized two kinds of immunity defenses. *Id.* at 807; s*ee also Lomaz v. Hennosy*, 151 F.3d 493, 497 (6th Cir.

----

[7]Byerley's only argument on appeal regarding whether he was acting under color of state law is as follows:

**II. Was Defendant Acting Under Color of State Law?**

Dean is correct that Byerley acknowledged in his answer that the only reason Dean was at Byerley's house on the morning of March 27, 2001 was because of his status as Regulation Counsel for the State Bar, and that Dean's allegations arose from the events of that morning.

Even if Byerley was acting under color of state law, Dean's claims would be barred by governmental immunity.

Appellee's Br. at 25.

[8]In his appellate brief, Byerley lumps together his assertions that he is entitled to Eleventh Amendment immunity, absolute immunity, and qualified immunity. Because Dean sued Byerley in Byerley's individual capacity, Eleventh Amendment immunity does not shield Byerley from Dean's damages claims. Byerley's assertions that he is entitled to absolute immunity and qualified immunity — which *when applicable* protect public officials sued in their individual capacity from damages claims — will be discussed in more detail in Sections II.C.1 and C.2.

1998). First, "[f]or officials whose special functions or constitutional status requires complete protection from suit, we have recognized the defense of 'absolute immunity.'" *Harlow*, 457 U.S. at 807. For example, the Supreme Court has recognized the defense of absolute immunity for legislators performing legislative functions, judges performing judicial functions, prosecutors performing prosecutorial functions, and the President of the United States in his official capacity. *Id.*; *see also Holloway v. Brush*, 220 F.3d 767, 774-75 (6th Cir. 2000) (en banc). The defense of absolute immunity provides a shield from liability for acts performed erroneously, even if alleged to have been done maliciously or corruptly. *Watts v. Burkhart*, 978 F.2d 269, 272 (6th Cir. 1992) (en banc); *see also Lomaz*, 151 F.3d at 497. Second, "[g]overnment officials who perform discretionary functions are generally entitled to qualified immunity and are protected from civil damages so long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pray v. City of Sandusky*, 49 F.3d 1154, 1157 (6th Cir. 1995) (quoting *Harlow*, 457 U.S. at 818); *see also Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003). The district court did not address these immunity defenses because it concluded that Dean failed to establish a § 1983 claim.[9]

Although Byerley does not expressly argue on appeal that he is entitled to the defense of absolute immunity, he does rely on case law addressing the scope of absolute immunity and quotes a long passage from one of those cases pertaining to absolute immunity.[10] Appellee's Br. at 29. Also, Byerley

----

[9]The district court held that Dean failed to establish that Byerley acted under color of state law.

[10]On page 29 of his appellate brief, Byerley quotes the following passage from *Watts v. Burkhart*:

The immunity of participants in the judicial process stems not from the "location" of the judicial process in one branch of government or another . . . but from the "characteristics" of the

expressly raised the defense of absolute immunity during the hearing on his motion for summary judgment, after which the parties both submitted supplemental briefs on the issue. Summ. J. Hr'g Tr. at 5-7; R. at 56-57. Because Byerley may be asserting the defense of absolute immunity, we will address the issue.

"The burden of justifying absolute immunity rests on the official asserting the claim." *Harlow*, 457 U.S. at 812; *see also Lomaz*, 151 F.3d at 497. Therefore, Byerley had the burden of proving that he is entitled to absolute immunity. During the hearing on Byerley's motion for summary judgment, Byerley argued that "[t]he Supreme Court of the State of Michigan in Rule 15 of the rules concerning the State Bar of Michigan, granted absolute immunity to state bar staff for conduct arising out of the performance of their duties." Summ. J. Hr'g Tr. at 5. Later, in his supplemental brief, Byerley conceded that state rule 15 is irrelevant to the scope of his immunity in this action because the scope of immunity in a § 1983 action is determined by federal law. Def's Second Supplemental Br. in Supp. of Mot. for Summ. J. at 12; *see also Howlett v. Rose,* 496 U.S. 356, 376 (1990); *Wood v. Strickland*, 420 U.S. 308, 314 (1975). Byerley was correct to retreat from his reliance on state rule 15 because the Supreme Court has held that state-law immunities are irrelevant in § 1983 actions. *Howlett*, 496 U.S. at 376. Furthermore, in a recent decision, this court held explicitly that state rule 15 does not immunize employees of the State Bar of Michigan

process. One of these characteristics is that the controversies with which the process deals are often "intense," and the loser, given an opportunity to do so, will frequently charge the participants in the process with unconstitutional animus; "[a]bsolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation." "Absolute immunity is designed to free the *judicial process* from the harassment and intimidation associated with litigation."

Appellee's Br. at 29 (quoting *Watts*, 978 F.2d at 273) (citations omitted).

from liability in § 1983 actions because state-law immunities cannot be used to defeat § 1983 claims. *Dubuc v. Michigan Bd. of Law Exam'rs*, 342 F.3d 610, 617 (6th Cir. 2003). Nonetheless, Byerley argued he is entitled to absolute immunity because the "Supreme Court of Michigan delegated to the State Bar of Michigan the responsibility to investigate the Character and Fitness of all applicants to the Bar . . . [and t]his is an inherently judicial function." Def.'s Second Supplemental Br. in Supp. of Mot. for Summ. J. at 2.

The cases cited by Byerley in his appellate brief are relevant to the scope of Byerley's immunity in this action, but they do not support his assertion that he is entitled to the defense of absolute immunity. Appellee's Br. at 29 (citing *Watts*, 978 F.2d 269; *Ginger v. Circuit Court*, 372 F.2d 621 (6th Cir.), *cert. denied*, 387 U.S. 935 (1967)). In both *Watts* and *Ginger*, this court held that the absolute immunity that protects judicial officers engaged in judicial functions also protects other state officials engaged in adjudicative functions. *Watts*, 978 F.2d at 272-73; *Ginger*, 372 F.2d at 625. The holdings in both cases, however, were predicated upon findings that the defendant state officials were engaged in adjudicative functions. *See Watts*, 978 F.2d at 275-76 (holding that members of the Tennessee Board of Medical Examiners were entitled to absolute immunity for actions taken during proceedings to suspend plaintiff's medical license because the suspension proceedings were adjudicative in nature and appropriate procedural safeguards were in place); *Ginger*, 372 F.2d at 625 (holding that members of the Grievance Committee of the State Bar of Michigan were entitled to absolute immunity for actions taken during proceedings to revoke plaintiff's law license because the disbarment proceedings were adjudicative in nature). When deciding whether state officials are entitled to absolute immunity, courts must conduct a functional analysis. *Holloway*, 220 F.3d at 774; *Lomaz*, 151 F.3d at 497. Immunity is determined by the "nature of the function performed, not the identity of the actor who performed it."

*Holloway*, 220 F.3d at 774 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)) (internal quotation marks omitted).

In *Barrett v. Harrington*, 130 F.3d 246 (6th Cir. 1997), *cert. denied*, 523 U.S. 1075 (1998), we discussed the factors that courts must consider when determining whether an act is judicial in nature, and thus protected by absolute immunity.[11] First, the court must consider whether the function is normally performed by an adjudicator. *Id*. at 255. However, even if an act is not normally performed by an adjudicator, the court should look to the act's relation to a general function normally performed by an adjudicator. *Id*. "This functional approach examines the 'nature' and 'function' of the act, not the act itself." *Id*. Second, the court must consider whether the plaintiff dealt with the defendant in the defendant's adjudicative capacity.

In *Barrett*, this court was faced with the question of whether a judge was entitled to absolute immunity from liability for actions she took in response to a litigant's public criticism of her. *Id*. at 253. The judge sent letters to prosecutors stating that the litigant was harassing her. Those letters prompted an investigation of the litigant. The judge also made statements to the news media accusing the litigant of stalking her. We determined that absolute immunity shielded the judge from liability for her letters to the prosecutors because the judge was attempting to preserve the integrity of the judicial process, which is a function related to those normally performed by an adjudicator. *Id*. at 258-59. Furthermore, the litigant's harassment stemmed from the judge's adverse decision against him; therefore, the litigant

[11]Although *Barrett* addresses the scope of the absolute immunity that shields judges engaged in judicial functions, its analysis also applies to the scope of the absolute immunity that shields other public officials engaged in adjudicative functions. *See Barrett*, 130 F.3d at 255-57. This is because the scope of absolute immunity depends upon the function performed by the defendant, not the identity of the defendant. *Watts v. Burkhart*, 978 F.2d 269, 275-76 (6th Cir. 1992) (en banc).

dealt with the judge in her adjudicative capacity. *Id*. at 260. However, we also determined that absolute immunity did not shield the judge from liability for her statements to the media because speaking to the media about a litigant does not preserve the integrity of the judicial process, and instead merely informs the public of the judge's views. *Id*. at 261.

In this case, the actions Byerley allegedly took in response to Dean's picketing are not functions normally performed by an adjudicator nor are they related to functions normally performed by an adjudicator. Although Byerley was employed as Regulation Counsel for the State Bar of Michigan and although the Bar is merely an extension of the Michigan Supreme Court for purposes of deciding whether to grant or deny Bar applications, it is clear on the record as it now stands that Byerley was not performing an adjudicative function during the March 27, 2001 confrontation.[12] Dean alleges that in response to his picketing, Byerley threatened that Dean would never practice law in the state of Michigan and threatened to have the picketers arrested. Neither of these actions are related to the decision of whether to grant or deny Dean's Bar application. While reporting an applicant's conduct to the police and the Bar might be related to the functions normally performed by an adjudicator, the actions Dean alleges that Byerley took were of a different function and nature. Byerley's alleged actions were in the form of a threat for the purpose of intimidating Dean so that Dean would cease picketing. Byerley's alleged actions were not in the form of a statement to the police for the purpose of reporting conduct by Dean that was unlawful, or in the form of a statement to the Bar for the purpose of reporting conduct by Dean that reflected adversely on Dean's character. Because Byerley has failed to demonstrate in any way that he

[12]Since we conclude that Byerley was not performing an adjudicative function during the March 27, 2001 confrontation, we do not need to reach the question of whether Dean dealt with Byerley in an adjudicative capacity.

was engaged in an adjudicative function when he allegedly retaliated against Dean, Byerley is not entitled to summary judgment based upon the defense of absolute immunity.

## 2. Qualified Immunity

Byerley has expressly raised the defense of qualified immunity. Appellee's Br. at 27. Byerley argues that his alleged threats during the March 27, 2001 confrontation did not violate Dean's clearly established federal rights because targeted residential picketing is not a constitutionally protected activity. In Byerley's view, *Frisby* established that there is no right to engage in targeted residential picketing. Appellee's Br. at 28. Although Dean does not expressly refute Byerley's defense of qualified immunity in his appellate brief, Dean repeatedly argues that, in the absence of a time, place, or manner restriction, citizens have a constitutionally protected right to engage in targeted residential picketing. Also, during the hearing on Byerley's motion for summary judgment, Dean expressly refuted Byerley's defense of qualified immunity. Summ. J. Hr'g. Tr. at 14-18.

This court conducts a three-step analysis of qualified immunity claims.

First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quotation omitted). Although the policy of this circuit is to resolve

immunity questions at the earliest possible stage of the litigation, "[s]ummary judgment is not appropriate if there is a genuine factual dispute relating to whether [Byerley] committed acts that allegedly violated clearly established rights." *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir.), *cert. denied*, 534 U.S. 1071 (2001); *Mays v. City of Dayton*, 134 F.3d 809, 813 (6th Cir.), *cert. denied*, 524 U.S. 942 (1998).

On appeal, Dean argues that Byerley's alleged actions during the March 27, 2001 confrontation violated his clearly established First Amendment rights. Appellant's Br. 16-19. In his complaint, Dean alleged that Byerley threatened that Dean would never practice law in the state of Michigan due to his picketing, and that this threat referred to Dean's picketing in front of Byerley's house as well as to Dean's picketing at the State Bar of Michigan building. In his complaint, Dean also alleged that Byerley threatened to have the picketers arrested. At the hearing on Byerley's motion for summary judgment, Dean presented a sworn deposition from Larry Doolittle ("Doolittle"), one of the hired picketers, detailing the March 27, 2001 confrontation.[13] In his complaint, Dean further alleged that Byerley's threats chilled his desire to continue picketing and that he has not picketed near Byerley's residence or the State Bar of Michigan building since the confrontation.

---

[13] In a sworn deposition taken on June 19, 2001, Doolittle testified about the March 27, 2001 confrontation. Although Doolittle did not hear Byerley's alleged statement that Dean would never practice law due to his picketing, Doolittle did confirm several aspects of Dean's version of the confrontation. Doolittle Dep., June 19, 2001, at 28. More specifically, Doolittle stated that Dean and the two hired individuals only picketed on the street, that Byerley almost hit Dean with his car, and that Byerley threatened to have the picketers arrested if they did not leave. *Id.* at 19-20, 31. Doolittle also testified that during the confrontation, he heard Byerley whisper something to Dean and that afterwards, Dean exclaimed, "Did you hear what he said? You'll never practice law in Michigan as long as you're picketing." *Id.* at 28.

As discussed in Part II. B. 1. above, Dean had a constitutionally protected right to engage in peaceful targeted residential picketing, in the absence of an applicable time, place, or manner regulation, and retaliation against Dean for exercising that right would violate Dean's First Amendment rights. Therefore, Dean has satisfied the first hurdle necessary to survive summary judgment based upon qualified immunity by pointing to evidence showing that Byerley violated Dean's First Amendment rights. The Sixth Circuit precedent holding that a § 1983 claim can be predicated upon retaliation for exercising First Amendment rights and the Supreme Court precedent holding that peaceful picketing is constitutionally protected predate the March 27, 2001 confrontation, and thus the right to engage in peaceful targeted residential picketing, free from such retaliation, was clearly established at the time of the confrontation. *See Thaddeus-X*, 175 F.3d 378. Therefore, Dean has satisfied the second hurdle necessary to survive summary judgment based upon qualified immunity by showing that the constitutional right was clearly established. Finally, through his complaint and Doolittle's deposition, Dean has presented evidence that Byerley's alleged conduct was objectively unreasonable in light of Dean's clearly established First Amendment rights. Therefore, Dean has satisfied the third hurdle necessary to survive summary judgment based upon qualified immunity by pointing to evidence showing that what Byerley did was objectively unreasonable in light of clearly established constitutional rights.

Byerley's only arguments supporting his assertion that he is entitled to qualified immunity are that targeted residential picketing is not protected by the First Amendment, and that his March 29, 2001 letter demonstrates that he only objected to Dean's picketing on Byerley's private property. As discussed in Part II. B. 1. above, Dean had a clearly established right to engage in peaceful targeted residential picketing in the absence of a narrowly tailored time, place, or manner restriction. Also, Byerley never disputes, nor could he dispute, that Dean had a clearly established right to picket

the State Bar of Michigan building. Finally, Byerley's March 29, 2001 letter, which clarified that Byerley only objected to Dean's picketing on Byerley's private property, could not undo the previous constitutional violation. Because Dean demonstrated that he had a clearly established constitutional right and pointed to evidence that shows that Byerley violated that right, Byerley is not entitled to summary judgment based upon the defense of qualified immunity.[14]

## III. CONCLUSION

Dean had a constitutionally protected right to engage in peaceful targeted residential picketing in the absence of a narrowly tailored and applicable time, place, or manner regulation prohibiting such picketing. The district court erred in granting summary judgment to Byerley on the basis of its determination that Byerley did not act under color of state law during the March 27, 2001 confrontation. Additionally, we conclude that Byerley is not entitled to summary judgment based either on the defense of absolute immunity or on the defense of qualified immunity. Consequently, we **REVERSE** the district court's grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.

---

[14]Additionally, we note that even if Byerley were entitled to the defense of qualified immunity, the defense would only shield him from liability for Dean's claim for damages, not from Dean's claim for equitable relief, and thus would not end the action. This court has held that the defense of qualified immunity only bars claims for civil damages against officers in their individual capacities, not claims for equitable relief. *Flagner v. Wilkinson*, 241 F.3d 475, 483 (6th Cir.), *cert. denied*, 534 U.S. 1071 (2001); *Littlejohn v. Rose*, 768 F.2d 765, 772 (6th Cir. 1985), *cert. denied*, 475 U.S. 1045 (1986).

_____

**DISSENT**

_____

SUTTON, Circuit Judge, dissenting. I see this case differently. In *Frisby v. Schultz*, 487 U.S. 474 (1988), the Supreme Court rejected a First and Fourteenth Amendment challenge to a city ordinance that imposed a "complete ban" on "targeted residential picketing" because (among other reasons) it can "scarcely be doubted" that this medium of communication is "offensive and disturbing," because this type of picketing is directed at "captive audience[s]" who "are presumptively unwilling to receive" the message, and because such picketing invariably "invade[s] residential privacy." *Id.* at 487–88. Consistent with *Frisby*, the State of Michigan makes it unlawful "to engage in picketing a private residence by any means or methods whatever." Mich. Comp. Laws § 423.9f. On this record and under these circumstances, I fail to see how E. Stephen Dean can tenably claim that Thomas Byerley violated his constitutional rights, much less violated his clearly established constitutional rights, when Byerley objected to Dean's targeted residential picketing of his home on the morning of March 27, 2001. Add to this the undisputed fact that Byerley wrote Dean a letter two days after the picketing (but before the filing of this lawsuit) confirming he had "a right to exercise [his] First Amendment rights" in permissible ways, and it becomes difficult to understand why Mr. Dean ought to be able to make a $2 million federal case out of this incident. In my view, the district court properly rejected Dean's federal claims as a matter of law, and accordingly I respectfully dissent.

## I. BACKGROUND

While a considerable number of ambiguities cloud this *pro se* lawsuit, two things are clear: E. Stephen Dean had an unsatisfying experience in submitting his application to become a member of the Michigan Bar, and he believes that the defendant in this case, Thomas Byerley, sought to curb his efforts to engage in targeted residential picketing of Byerley's house over his Bar application. In order to explain my perspective on this case, the background to both points deserves some elaboration.

Dean is a graduate of the Thomas Cooley School of Law. In December 2000, he submitted his application for admission to the State Bar of Michigan. As he was delivering the application to the State Bar, he expressed concern to the Executive Director of the Bar that his application was not entirely complete. As a 60-year-old law-school graduate, he explained that he was unable to identify each of his places of residence over the course of his life and that he was concerned that the omissions might prejudice his efforts to gain admission to the Bar. When questioned by a Magistrate at the hearing on Byerley's motion for summary judgment, Dean recounted what he had told the Executive Director in the following words.

DEAN: I'm really concerned and what I'm concerned about is not withholding anything, but, my gosh, I can't remember where I was 3 years ago and an apartment number or something like that, and that has me a little nervous. . . . The people at the bar handling this stuff are under 30. Try explaining to somebody 25 years old . . . that you don't remember where you lived. They think you're crazy. I said, but if it's 40 or 41 years ago it can be tough. He said, oh, don't worry about that; I took the bar when I was in my 50s . . . they'll work with you. Well, that isn't what I got from the bar. I got no phone calls, you know, where were you and—I'd leave off a couple of months someplace. I've lived in several states. And they keep—first, they would ignore it for a couple of weeks and then they would write back the same old, same old, as if I were refusing to cooperate with them.

THE COURT: So they were trying to get information to complete your application that they felt you ought to

provide and you were having difficulty remembering the information that you needed to provide.

DEAN: They were refusing to accept my up-front—before I handed in the application, the attachment to it, that I've done my absolute best but it's difficult to remember 38 or 40 or 25 years ago an exact address. I've done my utmost here.

\*\*\*

THE COURT: All right. And then this dialogue went on between you and the staff members at the bar and eventually that led to your beginning this picketing?

DEAN: That's correct.

Summ. J. Hr'g Tr. at 38–39.

At some point after these exchanges with employees of the Michigan Bar, but before the State had acted on his Bar application and before he took the Bar exam, Dean began picketing about his application and about the treatment he had received from employees of the Michigan Bar. In his first protest, in March 2001, Dean hired two individuals to assist him in picketing the Michigan State Bar Building about the treatment he had received in submitting his Bar application. He paid each picketer $10 an hour.

Dean eventually extended his picketing to the residence of Thomas Byerley, the Regulation Counsel and Director of the Professional Standards Division for the Michigan Bar. Among other things, the Professional Standards Division oversees the Michigan Bar's Character and Fitness Department. Members of the Department investigate the backgrounds of all State Bar applicants and assess whether they have the requisite character and fitness to practice law in Michigan. They then submit their findings to the Board of

Law Examiners, which makes the ultimate admission decisions about each application.

Dean arrived at the Byerley residence on the morning of March 27, 2001, and brought with him the two mercenary picketers he had employed in earlier demonstrations. No sidewalk runs in front of Byerley's home. Therefore, according to Dean, he and his colleagues picketed on the public street in front of the Byerley home and solely on that part of the street in front of that home. According to Byerley, the protestors also demonstrated on his property.

When Byerley left his home for work that morning, a confrontation occurred. According to the allegations of the complaint, Byerley (1) threatened to have Dean arrested for illegal picketing and (2) told Dean he would never practice law in the State of Michigan due to his illegal picketing. After this confrontation and after Byerley had proceeded to work, Dean and the two other protesters left. Since then, Dean has not picketed Byerley's home or the State Bar Building.

Two days after this incident, on March 29, 2001, Byerley sent a letter to Dean about his picketing. In full, the letter reads as follows:

As you know, you and two other individuals were outside of my private residence on Tuesday, March 27, 2001 carrying signs. Although you have a right to exercise your First Amendment rights on public property, you do not have that right on private property.

On March 27 I verbally told you that you were on private property and that if you did not immediately leave I would call the police. This letter memorializes that statement. You are put on formal notice that you are never welcome on my private property and that if you trespass again I will ask that you be arrested.

Similarly, you are notified that you are not to enter the private property of any other State Bar of Michigan employee or officer.

Def.'s Br. in Supp. of Mot. for Summ. J., Ex. E.

Rather than respond to this letter or seek to clarify his authority to continue picketing, Dean filed this *pro se* complaint for $2 million against Byerley on April 4, 2001. He brought the claim in the United States District Court for the Western District of Michigan, contending that Byerley: (1) had violated his First (and Fourteenth) Amendment rights and 42 U.S.C. § 1983 by threatening to arrest Dean or retaliate against him for his residential picketing; (2) had committed a state-law assault by driving his car at Dean; and (3) had committed state-law libel by sending a letter to Dean claiming he had been trespassing. Dean sought $2 million in damages.

In July 2001, during discovery in the case, Dean voluntarily withdrew his Michigan State Bar application. At a motions hearing before a Magistrate on August 15, 2001, he said, "I withdrew [my Michigan State Bar application] because I thought it was best, and my letter of withdrawal to the bar stated this—not verbatim, Judge—but that I felt it would be best for me to get this lawsuit behind me before I went on with my application to the bar and, therefore, I'm withdrawing it at this time." Tr. of Aug. 15, 2001 Magistrate Mot. Hr'g at 9. At this hearing, in response to questions from the Magistrate, Dean clarified that he was not alleging that Byerley actually did anything to prevent him from being admitted to the Bar or that he would do that. *Id.* at 8. And he confirmed that he had not withdrawn his application because of fears that Byerley would block the application. *Id.* at 9–10. (Dean apparently has since become a member of the Missouri Bar.)

In August 2001, Byerley filed a Motion for Summary Judgment, which the Magistrate recommended granting. In

the Magistrate's view, Dean did not have a constitutional right to picket Byerley's residence in light of the Supreme Court's decision in *Frisby v. Schultz*, 487 U.S. 474 (1988), which upheld a content-neutral ordinance barring focused residential picketing. Accordingly, the Magistrate recommended that the court dismiss Dean's § 1983 claim and not retain supplemental jurisdiction over his state-law claims.

The district court agreed with this recommended disposition of the case but for different reasons. It concluded that Dean's § 1983 claim failed as a matter of law because Byerley did not act under color of state law when he allegedly threatened Dean that he would not become a member of the Michigan Bar if he continued picketing at his home. Among other reasons for reaching this conclusion, the district court noted that Byerley did not have actual authority to reject or approve Dean's Bar Application. The court also dismissed Dean's state-law claims for lack of supplemental jurisdiction. Dean responded with this appeal.

## II. ANALYSIS

To obtain relief under § 1983, Dean must demonstrate that (1) a person acting under color of state law (2) deprived him of a right protected by either the Constitution or laws of the United States. *See Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001). In seeking $2 million in civil damages against Byerley in his individual capacity, Dean faces one more hurdle. He must show that the constitutional claim upon which he relies was "clearly established" at the time of the incident. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As this Court has put it: "[T]he question is whether any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994). State officials thus are "entitled to qualified immunity [when] their decision was *reasonable*, even if mistaken." *Pray v. City of*

*Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995) (quoting *Castro v. United States*, 34 F.3d 106, 112 (2d Cir. 1994)).

There are two ways to construe Dean's objection to Byerley's conduct, and neither of them suffices to establish a cognizable § 1983 claim in this instance. One possibility is that Dean believed Byerley sought to *prevent* him from picketing on the morning of March 27th. But this theory cannot succeed in view of the "color of state law" requirement. As a staff member of the Michigan State Bar, Byerley clearly did not have, or appear to have, authority to prevent Dean from picketing on his property or on the street in front of his property. He is not a law enforcement officer; Dean knew he was not a law enforcement officer; and Dean thus cannot say that Byerley was acting under color of state law in this respect during their confrontation on the morning of March 27th.

The second possibility, and the more probable one, is that Dean believed Byerley's conduct amounted to a threat of *retaliation* if Dean continued to picket. That is to say, Dean complains that Byerley threatened to undermine his efforts to become a member of the State Bar if Dean continued picketing at the Byerley home. A retaliation claim under § 1983 consists of three elements: (1) the plaintiff engaged in constitutionally protected conduct (here, conduct protected by the First Amendment); (2) the defendant took "an adverse action" against the plaintiff that would deter "a person of ordinary firmness" from continuing to engage in the conduct; and (3) the adverse action was in some way motivated by the plaintiff's protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 386, 394 (6th Cir. 1999) (en banc).

Dean cannot satisfy the first or second prong of this test. As *Frisby v. Shultz*, 487 U.S. 474 (1988) makes clear, his targeted residential picketing on the morning of March 27, 2001 did not amount to constitutionally protected conduct. And in view of Byerley's letter of March 29, 2001 (which removed any threat of retaliation) and in view of Dean's

decision voluntarily to abandon his Michigan Bar application (which eliminated anything to retaliate against), Dean cannot tenably claim that "a person of ordinary firmness" would have been dissuaded from engaging in legitimate speech by this incident.

### A. Dean Did Not Have a Clearly-Established Constitutional Right To Engage In Targeted Residential Picketing.

At issue in *Frisby* was a residential picketing ordinance enacted by the town of Brookfield, Wisconsin. The ordinance made it "unlawful for any person to engage in picketing before or about the residence or dwelling of any individual" and was designed to "protec[t] and preserv[e] the home" by ensuring "that members of the community enjoy in their homes . . . a feeling of well-being, tranquility, and privacy." 487 U.S. at 477. The Town Board also believed that "the practice of picketing before or about residences and dwellings causes emotional disturbance and distress to the occupants . . . [and] has as its object the harassing of such occupants." *Id.*

In reviewing the ordinance, the Court first determined that it was "content neutral," which is to say it banned all residential picketing regardless of the subject matter of the speech. *Id.* at 481–82. The Court then applied the familiar time-place-and-manner test applicable to content-neutral regulations of speech in traditional public fora. Writing for the Court, Justice O'Connor first reasoned that the ordinance left open "alternative channels of communication" as it applied only to picketing directly in front of a single residence. *Id.* at 483–84. She then explained that the ordinance served a "significant government interest" because "'the State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.'" *Id.* at 484 (quoting *Carey v. Brown*, 447 U.S. 455, 471 (1980)). That was particularly true in the context of a ban on targeted residential picketing, she added, given the importance of "protect[ing]" "unwilling

listener[s]" in their own homes. *Id.* at 484–85. Lastly, she concluded that the ordinance was "narrowly tailored to protect only unwilling recipients of the communications" because "the type of picketers banned by the Brookfield ordinance generally do not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way." *Id.* at 485–86. The means-end fit between the objectives of the ordinance and the methods of furthering them sufficed, the Court observed, since the "devastating effect of targeted picketing on the quiet enjoyment of the home is beyond doubt." *Id.* at 486. *See id.* ("To those inside . . .[,] the home becomes something less than a home when and while the picketing . . . continue[s] . . . . [The] tensions and pressures may be psychological, not physical, but they are not, for that reason, less inimical to family privacy and truly domestic tranquility.") (internal quotations omitted).

Fifteen years after *Frisby*, it is difficult to understand how Mr. Dean can claim that he had a constitutional right, let alone a "clearly established" constitutional right, to engage in what he acknowledges was targeted residential picketing of the Byerley home on the morning of March 27th. That conclusion seems not just improbable but impossible in the aftermath of *Frisby*, a decision that to my knowledge uniformly has been followed by the lower courts in the last decade and a half.

Making the parallels between this case and *Frisby* more salient still is the existence of a Michigan statute that, like the ordinance in *Frisby*, specifically bans residential picketing. As the majority points out, the parties' briefs in the district court and in this Court seemed to assume that Michigan does not ban targeted residential picketing. Apparently, in the State's view of this dispute, the existence of *Frisby* as well as the general prohibition against trespassing on private property sufficed to reject this constitutional claim. Appellee Br. at 20, 23–24. When this line of thinking was challenged at oral argument, counsel for Byerley insisted that Michigan law

does prohibit such picketing but did not offer any specific authority to support this proposition.

Further review confirms that a Michigan statute *does* prohibit private residential picketing. Under Mich. Comp. Laws § 423.9f, "[i]t shall be unlawful . . . to engage in picketing a private residence by any means or methods whatever: Provided, That picketing, to the extent that the same is authorized under constitutional provisions, shall in no manner be prohibited." Violations of the section are treated as a misdemeanor. *Id.*

The majority concludes that this provision does not apply here because it should be construed to apply only to picketing regarding labor-related matters. Maj. Op. at 9. I disagree with that conclusion. Dean *was* picketing about a matter related to labor and employment—namely, his effort to become a lawyer in the State of Michigan and his effort to be available for employment in that profession. When individuals attempt to become members of the legal profession, as when they are regulated in the profession, they are involved in a matter of labor—or at least employment. That is particularly true here in view of Dean's apparent claim that employees of the Michigan Bar showed an age bias against him in discussing his application with them.

The provision, at any rate, plainly covers all forms of picketing, whether employment-related or not. While the provision appears in a chapter of the Michigan Code labeled "Labor Disputes and Employment Relations," the statute by its terms applies to all residential picketing: It refers to all "picketing" of any "private residence" and "by any means or methods whatever." *Id.* A statute that comes with these kinds of explicit directions leaves no room for discretion—whether that discretion is invoked on the basis of the title of the law or its preamble. For neither the title of a statute nor the preamble of a bill has the capacity to impose a limitation that the statute explicitly removes. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("The title of a

statute . . . cannot limit the plain meaning of the text.") (quotation omitted); *Price v. Forrest*, 173 U.S. 410, 427 (1899) ("Although a preamble has been said to be a key to open the understanding of a statute, we must not be understood as adjudging that a statute, clear and unambiguous in its enacting parts, may be so controlled by its preamble as to justify a construction plainly inconsistent with the words used in the body of the statute."); *Browder v. Int'l Fidelity Ins. Co.*, 321 N.W.2d 668, 673 (Mich. 1982) ("A basic rule of statutory construction is that where the Legislature uses certain and unambiguous language, the plain meaning of the statute must be followed."); *King v. Ford Motor Credit Co.*, 668 N.W.2d 357, 363 (Mich. Ct. App. 2003) ("The preamble can neither limit nor extend the meaning of a statute which is clear. Similarly, it cannot be used to create doubt or uncertainty.") (quoting 2A Norman J. Singer, *Sutherland Statutory Construction* § 47:04, at 224 (6th ed. 2000)).

Nor does the preamble or title of this law—even if one of them could alter the plain meaning of the statute—lead to a different conclusion. The preamble (as amended in 1947 when the residential picketing ban was added) says only that the bill is designed generally to "limit the right to strike and picket." Mich. Comp. Laws § 423 pmbl. It does not restrict the provision to picketing on labor or employment matters, even though other portions of the preamble discuss subjects of the law in the limited context of labor and employment. *Id.* Likewise, while this anti-picketing legislation was enacted in an amendment to a piece of legislation with a labor and employment title, that fact tells us nothing about whether the legislature chose—as its words clearly indicate—to extend the ban to all forms of picketing rather than just some.

The surrounding legislative text of the provision also fails to change matters. Once again, it seems doubtful that surrounding text by itself ever could alter language as plain as this. *See Field v. Mans*, 516 U.S. 59, 67 (1995) (cautioning that a contextual inference "should not be elevated to the level of interpretive trump card"); *Conn. Nat'l Bank v. Germain*,

503 U.S. 249, 253–54 (1992) ("[A] court should always turn to one, cardinal canon before all others[,] . . . that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.") (internal quotations and citations omitted); *Browder v. Int'l Fidelity Ins. Co.*, 321 N.W.2d 668, 673 (Mich. 1982) ("A basic rule of statutory construction is that where the Legislature uses certain and unambiguous language, the plain meaning of the statute must be followed.").

This context-based argument also raises more interpretive questions than it answers. While two of the four prohibited activities covered by § 423.9f specifically relate to labor-and-employment picketing, two of them do not—thus removing the very inference the majority invokes. In full, the text reads:

It shall be unlawful (1) for any person or persons to hinder or prevent by mass picketing, unlawful threats or force the pursuit of *any lawful work or employment*, (2) to obstruct or interfere with entrance to or egress from *any place of employment*, (3) to obstruct or interfere with free and uninterrupted use of public roads, streets, highways, railways, airports, or other ways of travel or conveyance, or (4) to engage in picketing a private residence by any means or methods whatever: Provided, That picketing, to the extent that the same is authorized under constitutional provisions, shall in no manner be prohibited. Violation of this section shall be a misdemeanor and punishable as such.

(Emphasis added.) In view of the legislature's decision to specify a labor-and-employment orientation as to some prohibitions, but not as to others, the customary rule of interpretation is to assume that the legislature meant to give force to the differential language. *See Russello v. United States*, 464 U.S. 16, 23 (1983); *Cherry Growers, Inc. v.*

*Agric. Mktg. & Bargaining Bd.*, 610 N.W.2d 613, 622 (Mich. Ct. App. 2000).

Nor does adherence to the plain terms of this statute lead to an "absurd result," which is the only other possible explanation for disregarding words as clear as these. *See, e.g.*, *United States v. Rodgers*, 466 U.S. 475, 484 (1984) (plain language controls unless it leads to "absurd" results); *Brandon Charter Township v. Tippett*, 616 N.W.2d 243, 246 (Mich. Ct. App. 2000) (same). After all, the Michigan Legislature surely could have taken the view that a statute that proscribes all residential picketing on all topics of speech was not only fair—because it would avoid favoring one subject of speech over another—but it was the only choice available. A law that banned residential picketing when, and only when, the message of the demonstrator concerns labor would be patently unconstitutional. *See Carey v. Brown*, 447 U.S. 455 (1980) (invalidating a restriction on picketing that applied to all subjects, except labor, as impermissibly content based); *Frisby, supra* (upholding ban on targeted residential picketing because, among other reasons, the ban was content neutral). Far from being unusual to include a complete ban on targeted residential picketing in a bill about labor and employment issues, then, it was the only choice the Michigan Legislature had.

In the face of *Brown* and *Frisby* and in the face of the general prohibition against content-based regulations of speech, the doctrine of constitutional avoidance resolves any remaining doubts about the meaning of this law. Indeed, in *Frisby* itself, which also involved a criminal law, 487 U.S. at 477, the Court applied the same doctrine in construing the law at issue to apply just to *targeted* residential picketing. *Id.* at 482 ("The precise scope of the ban is not further described within the text of the ordinance, but in our view the ordinance is readily subject to a narrowing construction that avoids constitutional difficulties."). And in *Frisby,* the Court also accepted "the lower courts' conclusion that the Brookfield ordinance is content neutral" and rejected an argument that

the law should be construed to contain an *exception* for labor picketing—the mirror image of the problem we have here. *Id.* at 481–82. Thus, in *Frisby*, the Court accepted one narrowing interpretation of the law (making it applicable *only* to targeted residential picketing) and rejected one narrowing interpretation of the law (making it applicable to residential picketing on *all* topics, whether labor-related or not). In the same year the Court decided *Frisby*, it hewed to this path in *Boos v. Barry*, 485 U.S. 312 (1988). There, too, the Court accepted a narrowing interpretation of a District of Columbia criminal law prohibiting persons from congregating near embassies (making the law applicable *only* to violent protests), *id.* at 331, and rejected a narrowing interpretation of the law (making the law applicable to *all* protests, whether labor-related or not), *id.* at 333. *Cf. United States v. Seeger*, 380 U.S. 163, 176 (1965) (broadening the interpretation of "Supreme Being"—an awesome task to be sure—to "avoid[] imputing to Congress an intent to classify different religious beliefs, exempting some and excluding others").

Informed by *Frisby*'s (and *Boos*'s) example of minimizing rather than accentuating the potential infirmities of a law, I would follow a similar course here. The statute at issue makes it unlawful "to engage in picketing a private residence by any means or methods whatever." In the confines of this straightforward language, the statute cannot be narrowed to ban "picketing a private residence *on matters of labor and employment* by any means or methods whatever"—which is not what the statute says (or even suggests) and which no rule of construction with which I am familiar permits. An alternative approach would not only create a potential constitutional claim in this case against Mr. Byerley but would also invalidate the Michigan residential picketing statute—a two-for-the-price-of-one constitutional ruling that cannot coexist with the salutary premises of the constitutional avoidance doctrine.

This is all the more true in a qualified immunity setting where the question is not just whether Dean had a right to

picket Byerley's home, but also whether that right was clearly established in March 2001. *See Sanatana v. Calderon*, 342 F.3d 18, 30 (1st Cir. 2003) (Because "any ruling by us on the constitutional right question would be premised on our best judgment about the application [of a state law,] . . . . the best way for us to reconcile our competing obligations of faithful application of the federal law of qualified immunity and respect for the primacy of [state law] is to focus on the second step of the qualified immunity analysis—the clearly established question."). When the United States Supreme Court has upheld a "complete ban" on targeted residential picketing, when the State of Michigan has made it "unlawful . . . to engage in picketing a private residence by any means or methods whatever," and when no court has previously interpreted the scope of this seemingly straightforward text, it seems plain that Dean did not have a *clearly-established* right to picket Byerley's residence. *See Saucier v. Katz*, 533 U.S. 194, 206 (2001) ("Qualified immunity operates . . . to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful."); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."); *Santana*, 342 F.3d at 30–31 (holding that a state employee's Fourteenth Amendment due process right to retain her job was not clearly established because a property right was not clearly established under Puerto Rico law); *Young v. Harrison*, 284 F.3d 863, 868–69 (8th Cir. 2002) (holding that an evicted hotel guest's Fourth Amendment right to be free from a warrantless search of his hotel room was not clearly established because his continuing interest in the hotel room was not clearly established under South Dakota law). *Cf. Spruytte v. Walters*, 753 F.2d 498, 510–11 (6th Cir. 1985) (denying prison officials qualified immunity for due process violations where the meaning of a state regulation creating the property right was clearly established).

### B. Dean Did Not Suffer An Adverse Action That Would Deter A Person Of Ordinary Firmness.

In addition to failing to show that he was engaged in constitutionally protected conduct, Dean also has failed to show that Byerley took an "adverse action" against him that would deter "a person of ordinary firmness" from continuing to engage in the challenged conduct. Recall that just two days after this confrontation and before this lawsuit was filed, Byerley sent Dean a letter indicating that he was free "to exercise [his] First Amendment rights" so long as he did so on public, not private, property. In the aftermath of this letter, which Dean does not deny receiving and to which Dean never responded, the fact dispute of whether Dean picketed on private or public property becomes irrelevant. The letter makes clear that the picketing could continue, just not on Byerley's property. No rational juror could read this letter to say that Dean would still be at risk (from Byerley at least) by continuing to picket on public property.

Had Byerley followed through on his alleged threats, to be sure, his acts would have constituted "adverse action" of a constitutional magnitude. *See, e.g.*, *Hoover v. Radabaugh*, 307 F.3d 460 (6th Cir. 2002) (terminating a public employee is an adverse action); *Farmer v. Cleveland Public Power*, 295 F.3d 593, 602 (reducing a public employee's job responsibilities is an adverse action). But Byerley did not deny or obstruct Dean's Bar application or have Dean arrested. He allegedly just threatened to do so, then retracted the threat two days later.

Marginalizing his claim still further (and mooting his claim for injunctive relief), Dean concedes that he withdrew his Bar application voluntarily, not because of fears that Byerley would block it. Never to my knowledge has this Court found "adverse action" with respect to events as inconsequential as these. And, indeed, the extension of § 1983 to this setting serves to "trivialize the First Amendment" rather than to

reinforce it. *See Mattox v. City of Forest Park*, 183 F.3d 515, 521 (6th Cir. 1999) ("[A]llowing constitutional redress for every minor harassment may serve to trivialize the First Amendment."); *id.* at 522 ("A deliberate attempt to discredit [a public official], especially if initiated in retaliation for her actions in investigating the fire department, is perhaps an inappropriate and unfortunate occurrence, but on the facts of this case, it is not the type of 'adverse action' against which the First Amendment protects. It is not the equivalent of being fired by a government employer for expressing protected views."); *Thaddeus-X*, 175 F.3d at 398 (recognizing that "certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations" and that the courts may "weed out" such "inconsequential actions"); *Davidian v. O'Mara*, No. 99-5423, 2000 WL 377342, at *4 (6th Cir. Apr. 7, 2000) (being temporarily denied access to public information was not an adverse action); *Neier v. City of Pemberville*, No. 99-3104, 2000 WL 32008, at *4 (6th Cir. Jan. 4, 2000) (a threat made by defendant "that plaintiff would lose his job unless he dropped his [] claim" was not an adverse action where "[p]laintiff realized that [defendant] was without authority to carry out such a threat and plaintiff does not allege that [defendant] made an effort to have him terminated").

Like the district court before us (and the Magistrate as well), I believe that Dean's First Amendment claim fails as a matter of law. As these views have garnered a majority of one, I respectfully dissent.